# Illinois Official Reports

## Appellate Court

---

*People v. Hensley*, **2014 IL App (1st) 120802**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLOS HENSLEY, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-12-0802 |
| Filed<br>Rehearing denied | November 24, 2014<br>December 23, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed defendant's convictions for the attempted first degree murder and aggravated battery of a person who was driving a car that defendant thought belonged to a person who had been involved in a recent altercation with defendant and the first degree murder of a passenger in the car based on the court's holdings that the trial court did not err in admitting evidence of uncharged shootings and gun play which occurred shortly before the charged offenses, the State's alleged knowing use of the perjured testimony of a prosecution witness could not have affected the verdict, defendant's right to confront the witnesses against him was not violated by the admission of the testimony of a medical examiner who did not perform the autopsy on the murder victim, and the appellate court rejected defendant's argument that the Illinois precedent upholding the doctrine of transferred intent was outdated and illogical. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-14015; the Hon. Steven J. Goebel, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Caroline E. Bourland, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Delort and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury convicted defendant, Carlos Hensley, of first degree murder, attempted first degree murder, and aggravated battery with a firearm in connection with the May 24, 2008, shooting that killed Kiana Green and injured Christopher Smith. According to the State's evidence, Green and Smith were stopped at a red light while driving in a car owned by Delorean Standley. Standley was not in the car, but had been involved in an earlier altercation with defendant. The defendant, James Davis, and Bernard Norvell pulled up behind Green and Smith in another car. The State claimed that defendant was mistaken as to the occupants of Standley's car and fired multiple gunshots into the car, killing Green and injuring Smith. Davis, Smith, and Norvell identified defendant as the shooter at trial. The circuit court sentenced defendant to 45 years' imprisonment for first degree murder, with an additional 25 years' imprisonment for personally discharging a firearm during the murder, and 17 years' imprisonment for attempted murder, for a total of 87 years' imprisonment.

¶ 2    Defendant raises the following issues for our review: (1) whether the circuit court erred in admitting other-crimes evidence; (2) whether the State failed to correct the testimony of one of its witnesses and presented improper closing argument; (3) whether defendant's confrontation rights were violated when a medical examiner who did not perform the autopsy of the victim testified at trial; and (4) whether the evidence was sufficient to sustain defendant's conviction for attempted murder. Defendant admits that he did not properly preserve his first three claims of error for our review. He asks that we review his first two claims of error either under the plain error doctrine or as a claim of ineffective assistance of counsel. He asks this court to review his third claim of error, *i.e.*, whether his confrontation rights were violated, under only the plain error doctrine.

¶ 3    We hold that we must honor defendant's procedural default of his first two claims of error because he has not shown plain error or ineffective assistance of counsel. Specifically, the circuit court did not abuse its discretion when it admitted proof of other crimes as they were part of the continuing narrative of the crime defendant was charged with. Defendant's claims of prosecutorial error fail because he has not shown that the State knowingly used perjured testimony or that the State's closing rebuttal argument resulted in reversible error. Similarly, defendant has failed to show plain error when a medical examiner who did not perform the

autopsy of the victim testified at trial because the testimony and admission of the autopsy report did not violate defendant's confrontation rights. We uphold defendant's conviction for attempted murder because there is no reason to depart from Illinois precedent regarding the doctrine of transferred intent.

¶ 4                                           JURISDICTION

¶ 5        The circuit court denied defendant's motion to reconsider his sentence on February 29, 2012. Defendant timely filed his notice of appeal on the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                           BACKGROUND

¶ 7        Defendant was charged by indictment with first degree murder, attempted first degree murder, and aggravated battery with a firearm in connection with the May 24, 2008, shooting of Christopher Smith and Kiana Green. Green died from her injuries.

¶ 8        Prior to trial, the State filed a motion to admit proof of other crimes that occurred less than one hour prior to the shooting at issue in which defendant engaged in different criminal acts related to discharging a firearm that did not result in criminal charges. The State argued that these other crimes should be admitted to show defendant's motive, identity, and intent, and that it would present such proof of other crimes through the testimony of Darius Henry and Bernard Norvell. Henry would testify that on the night of the incident, between 8 and 9 in the evening, he was in the area playing dice with a group of men that included defendant's brother, Roselle. Henry and Roselle got into an argument over the game, and defendant eventually interceded on his brother's behalf. The argument turned into a fight, and defendant displayed a .357 handgun. Defendant told Henry to go get his gun, which Henry agreed to do. Henry returned to the scene with Ian "Marshaun" Rush, and Delorean Standley. Standley and Rush brought guns and began shooting at defendant. Defendant returned fire.

¶ 9        The State anticipated Bernard Norvell would testify that he went to defendant's house on the day of the shooting at approximately 10:40 in the evening. When he arrived, defendant pointed his gun at him, a .357 revolver. Norvell had seen defendant carry the gun before. Norvell grabbed the gun and fought with defendant until defendant told him he was just " 'fooling around.' " Defendant began recounting the details of his fight with Henry. He heard gunfire and observed Standley shooting at defendant. Defendant responded with gunfire, yelling " 'I see you, I see you.' " Later, defendant, Norvell, and James Davis drove around the area. The shooting at issue of Green and Smith occurred a short time later when Norvell, Davis, and defendant pulled up behind Green and Smith, who were driving Standley's car, a maroon Cutlass.

¶ 10        The State argued the fight between Henry, defendant, and Roselle was "inextricably linked" to the later retaliatory shooting at issue. The State contended that Standley and Rush shooting at defendant explained an otherwise unexplainable fact, *i.e.*, why defendant would get out of his car in traffic to shoot into Standley's car. Green and Smith were in Standley's car, which the State argued was proof that defendant intended to shoot Standley, but he shot Green and Smith. The State asserted that defendant's intent to kill Standley showed defendant's motive. Furthermore, the State pointed out that the gunfire evidence recovered from the crime

scene indicated the gun used was either a .38 or a .357. As such, Henry's and Norvell's testimony that they saw defendant with a .357 gun demonstrated identity. Henry's and Norvell's testimony also showed defendant's intent to kill Standley, which resulted in his shooting Green and Smith, the occupants of Standley's car. The State asserted the evidence was more probative than prejudicial and was not being introduced to show defendant's propensity to commit crime.

¶ 11    It appears from the record that defendant responded to the State's motion by filing several motions *in limine* seeking to bar the other-crimes evidence. Defendant argued that he acted legally in self-defense when he returned fire at Standley. He argued that the State's retaliation theory was speculative and irrelevant and would confuse the jury. According to defendant, the issues the jury should be concerned with were: whether Christopher Smith, an eyewitness and victim, really saw defendant shooting him; and whether Bernard Norvell and James Davis, the other eyewitnesses, were lying. Defendant sought to bar Norvell's testimony that he discussed the fight between Roselle and Henry, that defendant had a gun on him due to the earlier fight, that Henry was coming back, that defendant pointed his .357 revolver at Norvell in a joking manner, and that he rode around in a car drinking and smoking marijuana with Norvell and Davis.

¶ 12    At the hearing on the State's motion and defendant's motions *in limine*, the circuit court allowed the State to present evidence on the initial fistfight, defendant's alleged statement that Henry should go and get a gun, that Henry's associates returned with a gun, and that Standley shot at defendant. The court found that defendant's later statement, " 'there he goes,' " when he saw Standley's car provided motive for why the shooting took place. The court noted that the firearm evidence, that defendant had a .357 gun with him within an hour at or near the crime scene, was relevant and was "part and parcel of one fact pattern as to what happened." The court found that the prior crimes were not separate incidents. Rather, the court explained: "[T]he State is asking under proof of other criminal conduct even though[,] I believe[,] based on what's been related to me[,] that it is all one set of facts here, and I don't find it to be separate." The court further found the testimony to be relevant for intent and identity purposes. Later, when addressing Norvell's anticipated testimony, the court found that the "statement by the defendant as to why he had the gun and as to why they came back *** goes to the whole fact pattern in this case and is part of the general incident."

¶ 13    The State also petitioned the court prior to trial for a rule to show cause as to one of its eyewitnesses, Darius Henry, who had failed to appear in court pursuant to subpoena. The State commented that "I believe the police are looking for Mr. Henry in conjunction with an unrelated crime," and stressed that it did not know the status of the case, or "if there even is going to be a case." Defense counsel commented that "I was informed today that Mr. Henry is not only a fugitive from a pending case, it is a murder case." The court granted the State's petition for a rule to show cause and gave the State an opportunity to locate Henry.

¶ 14    Approximately a month later, the State informed the court that Henry had been arrested in Wisconsin "on the ACC contempt of court warrant" issued by the court. The State remarked that "I know that police were looking for Mr. Henry in conjunction with a murder and I believe that is why he did not appear here in court pursuant to that warrant, but it is my understanding from speaking to the detectives even as late as today that Mr. Henry has not been charged in the area two murder and no warrant has been issued for his arrest in the area two murder." Defense

counsel asked that the State provide any police reports regarding Henry for *in camera* inspection, which the court allowed.

¶ 15 At a later hearing, the court indicated to the parties that it had looked at the police report and decided not to tender it because it had "nothing at all to do with this case." The court noted, however, that Henry was a named suspect in the police report, and it allowed defense counsel to ask Henry if he was aware there was a pending murder investigation against him. The court also allowed the defense to ask whether Henry made a deal with the State. The State indicated to the court that it had spoken with Henry and told him that it would not be discussing any other unrelated incidents. The court allowed Henry to testify and commented that "[t]he fact [is,] it's a pending investigation, charges have not been approved."

¶ 16 Defendant filed a motion *in limine* prior to trial seeking to bar the testimony of the State's alternative medical examiner. Defendant explained that Dr. Michel J. Humilier performed the autopsy and authored the autopsy report of Kiana Green, the victim. Defendant argued that allowing a substitute witness for Dr. Humilier would violate his confrontation and due process rights. At oral argument, the State informed the court that Dr. Humilier had left the office of the medical examiner. The court denied defendant's motion *in limine* and allowed the State to present the testimony of an alternative medical examiner.

¶ 17 At trial, James Davis testified that he was with defendant and Bernard Norvell on the night of the shooting. When he first met defendant, defendant was playing with a gun, "pointing it toward" Norvell. Norvell told defendant to "stop playing like that." Davis testified further that they were standing in front of defendant's house when gunshots were fired. Davis and Norvell ran through the gangway, but defendant stayed and shot back. Defendant told the shooters that " 'I see you.' " Davis, Norvell, and defendant drove to a liquor store about a block and a half away to get something to drink and to smoke marijuana. After buying the liquor, Davis got in the backseat of the car, while Norvell drove and defendant sat in the front passenger seat. They drove around for 15 or 20 minutes. Davis smoked marijuana in the backseat and was not fully alert because he "was dozing off from the marijuana and the liquor." He then "felt a jerk" and heard a voice say " 'there they go.' " A burgundy Cutlass was stopped in front of them at a stoplight. Defendant got out of the car and Davis saw him shooting at the car. He saw glass shattering and muzzle flashes. Davis was "[s]hocked" and "stunned." When defendant returned to the car, Norvell told him, " 'Man, why the [expletive] did you do that out of my wife's car, my kids be in here.' " Norvell dropped defendant off approximately two to five minutes later. Davis admitted that he was compensated by the State for travel and lodging costs, and that he had a 2009 conviction for aggravated unlawful use of a weapon and a 2002 conviction for delivery of a controlled substance.

¶ 18 On cross-examination, Davis testified he was friends and cousins with Norvell. He "was cool" with defendant, and explained "[w]e never had no bad terms." Davis testified he was drinking vodka. He agreed that he signed a statement that indicated after the shooting, they drove around for 15 minutes before dropping defendant off. On redirect examination, Davis testified that in order to get to the backseat, he had to climb over the front seat because the back doors did not open.

¶ 19 Bernard Norvell testified that around the time of the shooting, he saw defendant regularly. He testified consistently with Davis's account of the events prior to the shooting at issue and added that, when defendant was playing around with the gun, it was a .357 revolver. Norvell testified that he, defendant, and James drove around in his wife's car. Norvell testified he drove

the car, James was in the backseat, and defendant occupied the passenger seat. While driving, Norvell pulled up next to a person named "B," whom he did not like. He asked defendant if he had a gun, and defendant said "No." Norvell admitted he would have shot "B" had defendant told him he had a gun.

¶ 20　　Norvell testified that upon driving back to near where the initial shooting occurred, defendant stated " 'there they go.' " Norvell saw a maroon, four-door Cutlass, which he explained "was the car that the shooter supposed to have." Norvell thought Delorean Standley and Darius Henry were in the car because Delorean Standley usually drove it. He noticed two people in the car. Defendant asked him to pull up to the side of the car, but he refused because he was under the impression that defendant did not have a gun on him. When he refused, defendant got out of the car. Norvell testified defendant then walked to the "back of the car on the passenger side and shot once through the back window." The back window shattered. He estimated that defendant shot the gun in the passenger side of the car five times. Norvell questioned defendant why he would do that in his car, because his kids use the car. Defendant disposed of the gun with a neighbor. Defendant thought he shot Henry in the passenger seat.

¶ 21　　Norvell admitted that he was not truthful when he first spoke to the police and denied that he knew who shot Kiana Green. He added that the back doors of the car he was driving, which belonged to his wife, were unable to be opened. Norvell admitted to having three prior felony convictions: two for unlawful use of a weapon, and an "aggravated domestic." He admitted that he had three pending cases against him: one for a probation violation, one for unlawful use of a weapon by a felon, and one for having his driver's license revoked. On cross-examination, Norvell clarified that he was not a cousin by blood with Davis; rather, it was through marriage.

¶ 22　　Darius Henry testified he was currently in custody for contempt of court for failing to appear after being subpoenaed in this matter. He was arrested in Wisconsin for occupying a vehicle without the owner's consent. When asked whether it was "[l]ike a stolen car," Henry answered "[y]es." Marijuana was found in the car. Henry testified that on the day of the incident, he was playing basketball and "[c]raps," a dice game, with defendant's brother, Roselle. Henry got into a fistfight with Roselle. Defendant interceded and told his brother to fight Henry. During the fistfight, defendant pulled out a gun, a .357 Magnum. Defendant told Henry to go get his gun. Henry called his brother, Ian "Marshaun" Rush, and Delorean Standley, so that they could get him a gun. Standley, Rush, and Henry then returned to defendant's house. Standley and Rush were armed, but Henry was not. Their plan was to shoot defendant. Upon arrival at defendant's house, Standley and Rush fired multiple shots at defendant. Defendant shot back and yelled, " 'Come on, [expletive].' " The last thing Henry heard was defendant saying " 'I'm gonna kill you, [expletives].' " Henry described the shooting as a "shoot-out" that lasted "maybe a minute and a half." Henry ran when defendant started shooting back. Henry testified Standley drove a maroon Cutlass.

¶ 23　　On cross-examination, defense counsel asked Henry the following question:

"MR. MAYFIELD [Assistant Public Defender]: However, you are under investigation or the subject of a murder investigation here in Chicago, aren't you?

A. Not that I know of.

Q. You didn't hear anything about that?

A. No, sir."

¶ 24      Henry clarified on cross-examination that defendant was the only person that did not run in the shoot-out.

¶ 25      Christopher Smith testified that on the day of the shooting, he was with his girlfriend, Kiana Green. He called Delorean Standley, a friend of his, so that he could "switch cars with him." He traded cars with Standley because he did not like his car anymore and was trying out Standley's car. After switching cars, he drove around with Green. At approximately, 11:30 p.m., Smith stopped at a red light. Green was on the passenger side. He then saw, through his rearview mirror, defendant get out of the car, and walk toward him. Smith testified that "I just hear a shot and then I tried to pull off. I felt myself getting shot up." He was hit five times and heard five or six gunshots. He tried to pull away, but lost control of the car. Eventually, he gained control of the car and drove to Trinity Hospital.

¶ 26      Smith initially did not tell the police because he "wanted to take care of it" himself, which meant that he wanted to kill defendant. His mother convinced him to speak with the police. He admitted he was convicted of unlawful use of a weapon by a felon in 2008, aggravated unlawful use of a weapon in 2003, and possession of a stolen motor vehicle in 2000. On cross-examination, Smith testified he wanted defendant convicted. He also admitted to smoking marijuana that evening. He added that Green was asleep in the front seat. He saw the shooter get out the front seat, and he thought that defendant came within five or six feet of the car.

¶ 27      Officer Eric Szwed, a forensic investigator for the Chicago police department, testified he and his partner processed the vehicle containing the victims of the shooting, a 1992 maroon Oldsmobile. The vehicle had gunshot damage to it including shattered windows and holes in the doors. Glass fragments were found at the scene of the shooting. Bullet fragments were collected from Christopher Smith's shirt. On cross-examination, Officer Szwed stated that there was no physical evidence at the scene of the crime linked to defendant and no gun was recovered.

¶ 28      Melissa Nally, a forensic scientist with the Illinois State Police, testified as an expert in firearm's identification. She analyzed the following evidence: "One fired bullet jacket fragment, one metal fragment, one fired bullet jacket, another fired bullet jacket, a fired bullet core, and another fired bullet jacket." She found all the items were fired from the same weapon, either a .38 or .357. She did not have a gun to examine.

¶ 29      Detective Shirley Colvin of the Chicago police department testified she was assigned to investigate the shooting. When she arrived at the scene, the only evidence of the crime was glass on the street. She and her partner went to Trinity Hospital and found the vehicle, which she learned was owned by Delorean Standley. She eventually spoke with the living victim, Christopher Smith, but he was uncooperative. Detective Colvin's second attempt to interview Smith was also unsuccessful. Eventually, Smith agreed to speak with her.

¶ 30      On cross-examination, she admitted that Smith told her that the shooter got out of the backseat of the car, ran up to his car, and started shooting. She further admitted that they never found Norvell's car and, thus, never determined if the back doors were inoperable. On redirect examination, Detective Colvin clarified that Smith "said it was the passenger side of the vehicle, maybe the backseat." Detective Colvin agreed that Smith was not definitive that the shooter came out of the backseat. Smith was looking out the rearview mirror. On re-cross-examination, she testified "He said that the shooter got out of the passenger side of the

car, possibly the backseat or maybe the backseat." She then clarified her report does not say "maybe," only "possibly."

¶ 31 Dr. Ariel Goldschmidt, an assistant medical examiner for Cook County, testified as an expert in forensic pathology. He explained that as a medical examiner, he investigates sudden and unexpected deaths by performing autopsies and reviewing records. Regarding Green's death, he testified it was caused by a gunshot wound to the head, which he classified as a homicide. Dr. Goldschmidt did not perform the autopsy on Green; Dr. Michel Humilier did. At the time of trial, Dr. Humilier was no longer employed with the Cook County medical examiner. Dr. Goldschmidt agreed that he was essentially testifying in his place, but that he had formed his own opinion. In reaching his opinion, he reviewed photographs, the autopsy report, and hospital records. The top of Green's head contained two injuries, a circular hole and a large irregular hole. The bullet from the shooting entered the right side of Green's head near the top and moved downward and leftward and lodged in the brain. The bullet damaged the brain. Dr. Humilier saw gunpowder stippling, which Dr. Goldschmidt explained as: "If a gun is fired at a certain range, there's gunpowder that exits the muzzle *** and causes a pattern impression on the skin." Stippling can indicate the range of a gunshot. Dr. Goldschmidt did not agree with Dr. Humilier's opinion regarding the stippling found on Green. After reviewing the photos, Dr. Goldschmidt thought that "pseudo-stippling" occurred. He defined pseudo-stippling as "when a bullet goes through glass, like a window, it shatters the glass into very small pieces that can mimic gunpowder in the same pattern that the little pieces gunpowder would make that can be made by little pieces of glass."

¶ 32 On cross-examination, Dr. Goldschmidt reiterated that he did not perform the autopsy and clarified that he was not present during the autopsy. He had not talked to Dr. Humilier regarding the autopsy. Dr. Goldschmidt testified that stippling can occur in shooting ranges up to four feet, depending on the type of gun. He disagreed with Dr. Humilier's opinion on the stippling because of the irregularity and size of the stippling marks.

¶ 33 A certified copy of the autopsy report was marked as an exhibit for the State. The report was admitted into evidence, but it did not go back to the jury. The autopsy report shows that Dr. Humilier examined Kiana Green's body on May 29, 2008, and signed the report on June 9, 2008. The seal indicating it to be a certified copy is dated July 7, 2011.

¶ 34 Rhonda Pitts testified that although she is married to Bernard Norvell, they were separated at the time of trial. She owned the car Norvell drove on the day of the shooting. According to Pitts, the rear doors never had any problems being locked. On cross-examination, Pitts agreed that she could not remember if there were any problems with the back doors. She later answered "Right" when asked, "There was a period of time when the doors didn't work, but you couldn't remember when that was, right?"

¶ 35 Dennis Shaw, an investigator for defendant, testified he interviewed Pitts on June 26, 2011. According to Shaw, Pitts told him that the rear doors worked and there was no problem with the vehicle when she owned it. Marshon Meekins testified he worked on Pitts's car and never noticed anything wrong with the rear doors. On cross-examination, he admitted he never worked on the car in 2008.

¶ 36 The parties stipulated that Mary Smith, Christopher Smith's mother, would have testified that she spoke with her son in the hospital after the shooting. Her son related to her that he had no idea who shot him. The parties further stipulated that Kevin Green and Anita Green, the deceased victim's parents, would have testified that they spoke with Christopher Smith in the

days following the shooting. They would have testified that Smith could not provide any information identifying the shooter. The parties further stipulated that Officer B. Carmickle would testify that Christopher Smith told him at the hospital that that "an unknown offender or offenders came from behind and began shooting at the victims."

¶ 37 Prior to closing arguments, the court admonished the jury that closing arguments are not evidence and that statements not based on evidence or reasonable inferences to be drawn from the evidence should be disregarded.

¶ 38 During its opening closing argument, the State focused on how the jury instructions applied to the evidence presented and argued the evidence showed defendant's guilt. Defense counsel, during his closing argument, characterized the State's witnesses as "liars, criminals, [and] killers." Defense counsel argued that both James Davis and Bernard Norvell also had motive to shoot at Delorean Standley and noted that Darius Henry "came in in shackles." Defense counsel argued that instead of shooting Henry after the fight with defendant's brother, defendant told him to go get a gun, which made "it fair." Defense counsel stated "[i]t's a different society there, the rules are different but the people are people." Defense counsel further argued that Davis and Norvell were "cold blooded killers" and "gun wielding felons" and that "[t]hey are bad people, proud to kill." Defense counsel stressed that Norvell is a liar who would lie to get out of being charged for the murder. He further argued that James and Norvell were going to stick together because they were family, whereas defendant was just "an acquaintance." According to defense counsel, Norvell and James did not call the police because they committed the crime. He also described Christopher Smith as "not a truth teller" and questioned the accuracy of Smith's identification of defendant as the shooter based on the time of night and Smith's admission that he smoked marijuana.

¶ 39 In rebuttal, the State commented on defense counsel's remarks that the area of the shooting was a "different society." The State admitted that its own witnesses, Norvell, Henry, and Smith, were outlaws who typically would not call the police, but it asked the jury not to reject them for coming forward in this matter.[1]

¶ 40 The jury was instructed, in relevant part, that neither opening nor closing statements are evidence and arguments or statements made by an attorney that are not based on the evidence should be disregarded. The jury was also instructed that defendant had been involved in conduct other than that charged in the indictment. The instruction stated, "This evidence has been received on the issues of the defendant's identification, presence, intent, and motive and may be considered by you only for that limited purpose." The instruction further provided that it is up to the jury "to determine whether the defendant was involved in conduct and, if so, what weight should be given to this evidence on the issues of identification, presence, intent and motive."

¶ 41 The jury found defendant guilty of first degree murder and aggravated battery with a firearm and that during the commission of the offense of attempted first degree murder, defendant was armed with a firearm. The jury found that during the commission of first degree murder defendant personally discharged a firearm that proximately caused the death of another person.

¶ 42 Defendant filed a motion for a new trial, which the circuit court denied. The circuit court sentenced defendant to 45 years' imprisonment for first degree murder, with an additional 25

---

[1]We will discuss the State's rebuttal closing argument in more detail in the analysis section.

years for personally discharging a firearm during the murder, and 17 years' imprisonment for attempted murder, for a total of 87 years' imprisonment. The circuit court denied defendant's motion to reconsider his sentence. Defendant appealed.

¶ 43                                                    ANALYSIS

¶ 44          Before we address defendant's claims of error individually, we note that defendant admits that he failed to properly preserve for our review his first three claims of error. He asks that we review his first two claims of error, *i.e.*, whether the circuit court erred in admitting other-crimes evidence and whether the State failed to correct false testimony and made improper closing argument, under either the plain error doctrine or as a claim of ineffective assistance of counsel. He asks that we review his third claim of error, *i.e.*, whether his confrontation rights were violated by Dr. Goldschmidt's testimony and the admission of the autopsy report, under only the plain error doctrine.

¶ 45          The plain error doctrine allows this court to reach forfeited errors affecting substantial rights in two instances: (1) "where the evidence *** is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence"; and (2) "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Under the "closely balanced" prong of the plain error doctrine, the defendant must show prejudicial error, while under the second prong, prejudice is presumed. *Id.* at 187. Defendant bears the burden of persuasion under either prong of the plain error doctrine. *Id.* A defendant's failure to carry the burden of persuasion results in the procedural default being honored. *People v. Eppinger*, 2013 IL 114121, ¶ 19. The first step in plain error analysis is to determine whether an error occurred at all. *Id.*

¶ 46          The right to the effective assistance of counsel is guaranteed under both the federal and state constitutions. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing U.S. Const., amends. VI, XIV, and Ill. Const. 1970, art. I, § 8). Ineffective assistance claims are analyzed under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), as adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prove ineffective assistance of counsel, defendant has to show both deficient performance of trial counsel and that trial counsel's performance prejudiced him. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). Defendant has the burden of proving that he did not receive the effective assistance of counsel. *People v. Rucker*, 346 Ill. App. 3d 873, 885 (2003). To establish prejudice, a "defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Easley*, 192 Ill. 2d 307, 317 (2000). If prejudice is not shown, a court can dispose of an ineffective assistance of counsel claim without first determining whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 47          The closely-balanced-evidence prong of the plain error doctrine and ineffective assistance claims based on evidentiary error are similar in that "[b]oth analyses are evidence-dependent and result-oriented." *People v. White*, 2011 IL 109689, ¶¶ 133-34. Under either analysis, a defendant has to show prejudice. *Id.* ¶ 133. Accordingly, where a defendant fails to show prejudice, a defendant's allegations of ineffective assistance of counsel and plain error under the closely-balanced-evidence prong both fail. *Id.* ¶ 134. Similarly, the failure of a defendant to show that error occurred at all defeats both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine. *People v. Rutledge*, 409 Ill. App. 3d 22, 25

- 10 -

(2011). As explained hereafter we conclude that defendant has failed to show error.

¶ 48                              Other-Crimes Evidence

¶ 49        Defendant contends the circuit court erred in admitting evidence of uncharged criminal conduct. Specifically, defendant believes it was improper to allow evidence showing that he returned fire after being shot at by Delorean Standley, pointed a .357-caliber revolver at Bernard Norvell, and threatened Darius Henry with a .357-caliber revolver. Defendant argues that the State improperly used this evidence to show his propensity to commit the charged offense and was not probative except to show his propensity for gun violence. In response, the State argues it properly presented a continuing narrative of the events that occurred on the evening of the incident. As such, the State argues it was not other-crimes evidence. Rather, it was admissible evidence of the continuing narrative of events. Accordingly, the State argues defendant cannot establish plain error or ineffective assistance of counsel.

¶ 50        Relevant evidence of other crimes is admissible "for any purpose other than to show a defendant's propensity to commit crimes." *People v. Chapman*, 2012 IL 111896, ¶ 19. These other purposes include motive, intent, identity, absence of mistake, *modus operandi*, "and any material fact other than propensity that is relevant to the case." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). If the prejudicial effect of evidence properly admitted for nonpropensity purposes outweighs its probative value, the circuit court can still exclude such evidence. *Id.*

¶ 51        Our supreme court "has recognized that evidence of other crimes may be admitted if it is part of the 'continuing narrative' of the charged crime." *People v. Pikes*, 2013 IL 115171, ¶ 20 (quoting *People v. Adkins*, 239 Ill. 2d 1, 33 (2010)). In such cases, ordinary relevancy principles apply and the rule related to other crimes is not implicated. *Rutledge*, 409 Ill. App. 3d at 25. This court has described evidence properly admitted as a continuing narrative as where intrinsic acts are " 'a necessary preliminary to the current offense,' " and where "the prior crime is part of the 'course of conduct' leading up to the crime charged." *People v. Morales*, 2012 IL App (1st) 101911, ¶¶ 24-25 (quoting *People v. Manuel*, 294 Ill. App. 3d 113, 124 (1997)). Uncharged crimes admitted as a continuing narrative "do not constitute separate, distinct, and disconnected crimes." *Pikes*, 2013 IL 115171, ¶ 20. Conversely, distinct crimes made for different reasons at different times and places will not be admitted as a continuing narrative. *Adkins*, 239 Ill. 2d at 33. We review the circuit court's ruling on the admission of evidence for an abuse of discretion. *Pikes*, 2013 IL 115171, ¶ 12.

¶ 52        We hold that the circuit court did not abuse its discretion when it admitted evidence showing defendant returned fire after being shot at by Delorean Standley, pointed a .357-caliber revolver at Bernard Norvell, and threatened Darius Henry with a .357-caliber revolver an hour prior to the shooting for which he was charged. The evidence that defendant possessed a .357-caliber revolver, and fired it, was relevant because the ballistic evidence showed that the murder weapon was either a .38 or a .357. The prior uncharged crimes evidence showed defendant instigated the chain of events that led to the eventual shooting at issue. First, defendant threatened Henry and told him to go get his gun after Henry fought his brother. Henry responded by returning with Standley and Rush, who began shooting at defendant. Defendant returned fire. Later, defendant spotted Standley's car and began shooting it and its occupants, Kiana Green and Christopher Smith. Accordingly, we find that the evidence admitted was "part of the 'course of conduct' leading up to the crime charged." *Morales*, 2012 IL App (1st) 101911, ¶ 25 (quoting *Manuel*, 294 Ill. App. 3d at 124). We agree

with the circuit court's characterization of the evidence as one continuous fact pattern and hold that the circuit court properly admitted the evidence as part of a continuing narrative of the crime charged. Therefore, the evidence was properly admitted. Accordingly, defendant's failure to show error occurred here is fatal to both his plain error and ineffective assistance of counsel claims. *Rutledge*, 409 Ill. App. 3d at 25.

¶ 53                                    Prosecutorial Errors

¶ 54        Next, defendant asks this court to review, either under the plain error doctrine or as a claim of ineffective assistance of counsel, whether the State failed to correct the allegedly false testimony of one of its witnesses and whether the State made improper closing arguments.

¶ 55                                       False Testimony

¶ 56        Defendant argues that the State failed to correct the false testimony of one of its witnesses, Darius Henry. Defendant argues the State knew Henry was a suspect in a murder case, yet failed to correct the following testimony, elicited during defendant's cross-examination of Henry:

> "MR. MAYFIELD [Assistant Public Defender]: However, you are under investigation or the subject of a murder investigation here in Chicago, aren't you?
>
> A. Not that I know of.
>
> Q. You didn't hear anything about that?
>
> A. No, sir."

¶ 57        In response, the State argues it is impossible to prove that Henry perjured himself when he said he was not aware he was a suspect in an unrelated case. According to the State, "unless the police took the bizarre step of telling a homicide suspect, not then in custody, that he was a homicide suspect, [Henry] had no way of knowing what was in the mind of the police officers."

¶ 58        It is a violation of due process for the State to knowingly allow perjured testimony to be used in a criminal prosecution. *People v. Jimerson*, 166 Ill. 2d 211, 223-24 (1995). "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *People v. Olinger*, 176 Ill. 2d 326, 349 (1997). The harmless error standard is this standard's equivalent. *Id.* Furthermore, a verdict will be set aside even where the State fails to correct testimony it did not solicit or where the false testimony only goes to the witnesses' own credibility. *People v. Wright*, 2013 IL App (1st) 103232, ¶ 47. The State is only obligated to correct the false testimony of a witness when it knows that such a witness is mistaken. *Id.*

¶ 59        Defense counsel's questioning of Henry during cross-examination resulted in Henry answering as to his own knowledge of any pending investigation. Defense counsel first asked him if he knew he was a suspect in a murder investigation, to which he responded, "Not that I know of." Defense counsel followed up by asking Henry, "You didn't hear anything about that," to which Henry responded "No, sir." The record is clear that both parties and the court knew of the pending murder investigation, and the court allowed defense counsel to ask Henry about his knowledge of the investigation. Absent from the record, however, is any indication that the State had knowledge that Henry knew he was under investigation for a murder and thus committed perjury. The State "believe[d]" that Henry failed to appear in court due to a pending

- 12 -

murder investigation, but never stated in the record that Henry knew the police were investigating him for murder. Henry testified he was eventually arrested in Wisconsin for occupying a vehicle without the owner's consent. Accordingly, it is impossible, based on the contents of the record, to determine whether the State had knowledge that Henry knew he was the subject of a pending murder investigation. Henry could have been avoiding court for a multitude of reasons, none of which are disclosed in the record. Therefore, we hold defendant's plain error and ineffective assistance claims fail because no error occurred here. *Rutledge*, 409 Ill. App. 3d at 25.

¶ 60    Even if the knowing use of perjured testimony occurred here, such a conviction will only be "set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict," a standard equivalent to harmless error. *Olinger*, 176 Ill. 2d at 349. We find that any error regarding Henry's alleged perjured testimony was harmless error. Unlike Christopher Smith, Bernard Norvell, and James Davis, Henry was not an eyewitness to the murder. The eyewitness testimony from Smith, Norvell, and Davis describing defendant shooting the victims provided overwhelming evidence of defendant's guilt. Also, the jury was apprised of unfavorable aspects of Darius's life, including his involvement in the prior fight with defendant that eventually led to a shootout, his Wisconsin arrest for occupying a vehicle without the owner's consent, and that the police found marijuana in the car. Accordingly, we hold Henry's alleged false testimony could not have affected the verdict.

¶ 61                                    Closing Argument

¶ 62    Defendant next argues that the State made improper remarks during closing argument that preyed on the passions of the jurors, misstated the law, and misstated the evidence. In response, the State argues that its closing arguments were properly based on the evidence or reasonable inferences from the evidence, or were invited by defense counsel.

¶ 63    We note that this court has recognized that there is confusion regarding what the proper standard of review is under these circumstances. *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 75-78. There appears to be a conflict between two supreme court cases: *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), which held that a prosecutor's statements during closing argument are reviewed *de novo*; and *People v. Blue*, 189 Ill. 2d 99 (2000) where the supreme court used the abuse of discretion standard. *Thompson*, 2013 IL App (1st) 113105, ¶¶ 75-78. We need not, however, make that determination at this time because here the result would be the same under either standard of review. *Id.* ¶ 78.

¶ 64    Generally, prosecutors are allowed wide latitude in making closing arguments. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *Id.* This is true "even if such inferences are unfavorable to the defendant." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). The State "must refrain from making improper, prejudicial comments and arguments," but "may *** respond to comments by defense counsel which clearly invite a response." *Id.* As such, defendant cannot complain that he was denied a fair trial by a prosecutor's reply when defense counsel provoked such a response. *Id.* at 445. In reviewing closing arguments, we must consider the whole argument as opposed to focusing on selected remarks or phrases. *Runge*, 234 Ill. 2d at 142. Reversible error only occurs "if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Id.*; *People v. Pasch*, 152 Ill. 2d 133, 185 (1992) ("Although the prosecutor's remarks may

sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different.").

¶ 65     Defendant first argues the State improperly argued during rebuttal closing argument that the crossing over of the State's witnesses from the underworld into our world made them more credible. Defendant argues this inflamed the passions of the jurors. In response, the State argues that it properly commented on the credibility of the witnesses and the facts of the crime. The State points out that the complained-of comments occurred during rebuttal argument, after defense counsel invited such a reply by calling the State's witnesses liars and incredible.

¶ 66     Our review of the record shows that during closing arguments, defense counsel characterized the State's witnesses as "liars, criminals, [and] killers." Defense counsel stated "[i]t's a different society there, the rules are different but the people are people." Defense counsel further argued that Davis and Norvell were "cold blooded killers" and "gun wielding felons," and that "[t]hey are bad people, proud to kill." According to defense counsel, Norvell and James did not call the police because they committed the crime. He described Christopher Smith as "not a truth teller." In rebuttal, The State argued that law-abiding citizens in the area where the crime occurred were "held hostage" by people such as Norvell, Smith, Davis, and defendant. The State argued as follows regarding the testimony of Norvell, Davis, Smith, and Henry:

> "They are trying. When they come to this court, when they finally tell the police the truth and they came into this court under oath to tell you the truth, they are trying not to be outlaws, they are trying to live in our world, because, make no mistake, ladies and gentlemen, and you have seen a tremendous example of it in this case, there is an underworld that exists just below us. We go about our lives, whatever we do, whatever kind of work we do, wherever we live, wherever we are raising families, there is this underworld.
>
> But this case is a perfect example of that underworld coming up and clashing in a collision with our world and in this case the world of Kiana Green."

¶ 67     The prosecutor then went on to state:

> "If we reject them because of the lives they have chosen for themselves, if we reject them because they are not like us, if we reject them because we say your world is your world and we're not a part of it, we are doing everyone a disservice but especially Kiana Green who is not of their world."

¶ 68     After reviewing the closing arguments in their entirety, we hold defendant invited a response regarding the credibility of the State's witnesses in rebuttal closing argument. As the above recitation of defense counsel's closing argument and the State's rebuttal shows, defense counsel attacked the credibility of the State's witnesses based on their history and section of society. It is well established that "when defense counsel provokes a response, the defendant cannot complain that the prosecutor's reply denied him a fair trial." *Hudson*, 157 Ill. 2d at 445. The State, in accordance with defense counsel's provocation, addressed the society of its witnesses and argued why they should be found credible despite their background. We find no reversible error here because defense counsel's closing argument invited the State's response that defendant now claims to be improper.

¶ 69     Defendant next argues the State misstated the law during rebuttal closing argument when it discussed the first jury instruction, which instructed the jury to consider only the testimony of the witnesses, the exhibits, and the stipulations that the court received. According to defendant, the State overemphasized the importance of what the witnesses told the jury over their past statements, and wrongly stated that past statements were not for the jury's consideration. The State argues that defendant is reviewing the prosecutor's comments out of context.

¶ 70     Our review of the closing arguments shows that the State urged the jury to read the first jury instruction in its entirety, which it recited as follows: "[T]he evidence which you should consider consists only of the testimony of the witnesses, the exhibits and the stipulations which the Court has received." The State then focused on the part of the instruction addressing "the testimony of the witnesses" which the State defined as:

> "That means we're not here to talk about who said what to the police at what time. It's the testimony of the witnesses. It's what Christopher Smith told you. It's what James Davis told you. It's what Bernard Norvell told you. That's what the evidence is."

¶ 71     The State then stressed to the jury that it was also to consider the exhibits and the stipulations.

¶ 72     After reviewing the entire closing argument, we agree with the State that defendant's argument here is based on one comment taken out of context. First, the State asked the jury to read the "whole" first jury instruction, which it then read. The State told the jurors that although they are to consider the stipulations and the exhibits, it wanted them to focus on the witnesses. The State then explained its version of why Christopher Smith initially lied to the police. In reviewing closing arguments, we must consider the whole argument as opposed to focusing on selected remarks or phrases. *Runge*, 234 Ill. 2d at 142. Here, we do not find that the State misstated the law after reviewing its whole argument. Although the State drew the jury's attention to its witness testimony, it did not misstate the law.

¶ 73     Defendant's final claim of error regarding the State's closing argument is that the State misstated the evidence. According to defendant, the State told the jury that Bernard Norvell implicated defendant in the crime only after the police confronted him with Christopher Smith's identification of defendant as the shooter. The State maintains that defendant misstates the facts contained in the record and conflates inferences with facts in making its claim of error.

¶ 74     We hold that even if we accept defendant's argument that the State improperly argued that Norvell only implicated defendant after being confronted with Smith's statement, we cannot say that the State's isolated remarks during rebuttal closing argument "resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." *Pasch*, 152 Ill. 2d at 185. In this case, the evidence of defendant's guilt was overwhelming, particularly because two other eyewitnesses, besides Norvell, identified defendant as the shooter. Furthermore, we must look at the closing arguments in their entirety and not focus on isolated comments or remarks. *Runge*, 234 Ill. 2d at 142. In the context of the lengthy closing argument presented by the State, we cannot say that one isolated remark concerning only one of the three eyewitnesses to the shooting would have changed the verdict. Accordingly, defendant has not shown ineffective assistance of counsel or plain error. *Rutledge*, 409 Ill. App. 3d at 25.

¶ 76       Defendant next asks this court to review, under the plain error doctrine, whether his right to confront the witnesses against him was violated when the State presented testimony from a medical examiner that did not perform the autopsy of the victim's body. According to Defendant, Dr. Goldschmidt testified to testimonial statements from Dr. Humilier's certified autopsy report. Defendant argues the report was then admitted for its truth, not to explain the basis of Dr. Goldschmidt's opinion. Defendant acknowledges our supreme court's opinion in *People v. Leach*, 2012 IL 111534, but argues that *Leach* is both distinguishable and incorrectly decided. In response, the State maintains that *Leach* is directly on point and controlling on this issue because the autopsy report was prepared in the normal course of business as part of the medical examiner's office's duties.

¶ 77       We agree with the State that *Leach* is controlling here. In *Leach*, our supreme court determined whether the admission of opinion testimony of a pathologist who did not perform the autopsy of the victim, and the admission of the autopsy report itself, violated a defendant's confrontation rights. *Id.* ¶ 1. The *Leach* court addressed the issue by first deciding whether the admission of the autopsy report violated the confrontation clause because "if the report was properly admitted, the expert witness's testimony cannot have violated the confrontation clause even if it had the effect of offering the report for the truth of the matters asserted therein." *Id.* ¶ 57. After holding that the admission of the autopsy report was admissible under either the Illinois Rules of Evidence (Ill. R. Evid. 803(6), 803(8) (eff. Jan. 1, 2011)) or state statute (725 ILCS 5/115-5.1 (West 2002)), the court determined whether the autopsy report was testimonial hearsay. *Leach*, 2012 IL 111534, ¶¶ 68-77. The court held that the autopsy report "was not testimonial because it was (1) not prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case." *Id.* ¶ 122. The court explained that the medical examiner's office conducted the autopsy, and prepared and submitted the report, pursuant to state law. *Id.* ¶¶ 126-32 (citing 55 ILCS 5/3-3013 (West 2010)). The court reasoned that: "An autopsy report is prepared in the normal course of operation of the medical examiner's office, to determine the cause and manner of death, which, if determined to be homicide, could result in charges being brought." *Id.* ¶ 130.

¶ 78       In the case at bar, Dr. Humilier's autopsy report was prepared in the normal course of business pursuant to the medical examiner's office's duties. Dr. Humilier performed the autopsy and the report under state law, for reasons of public health, not for the primary purpose of criminal litigation. The autopsy report here was not testimonial. Both the admission of the report and Dr. Goldschmidt's expert testimony did not violate defendant's confrontation rights. *Id.* ¶ 57 ("However, if the [autopsy] report was properly admitted, the expert witness's testimony cannot have violated the confrontation clause even if it had the effect of offering the report for the truth of the matters asserted therein."). We hold, as in *Leach*, that defendant's confrontation rights were not violated by the admission of Dr. Goldschmidt's expert testimony or the admission of a copy of the autopsy report.

¶ 79       Defendant argues that the autopsy report in this case is distinguishable to the report in *Leach* because he alleges it was "a certified autopsy report." In *Leach*, our supreme court noted that the autopsy report at issue was not sworn or certified. *Id.* ¶ 131. Rather, it was just signed by the doctor who performed the autopsy. *Id.* Recently, this court considered an autopsy report not to be certified or sworn even though a certified copy of the autopsy report was admitted into evidence. *People v. Crawford*, 2013 IL App (1st) 100310, ¶¶ 151, 151 n.12. Our review of

the autopsy report in this case shows, as in *Crawford*, that a certified copy of the report was admitted into evidence. Similarly, the autopsy report in this case, as in *Leach*, was signed by Dr. Humilier, but not sworn or certified. Defendant has not provided any argument addressing how a certified *copy* of the autopsy report is the same as a sworn or certified autopsy report. In fact, he does not even acknowledge in his brief that it was the certified copy that was admitted into evidence. It appears defendant's argument is based on a misreading of the autopsy report, which clearly shows it to be certified *copy*. Accordingly, we disagree with defendant's contention that the autopsy report in this case is distinguishable to the report in *Leach*. Defendant's plain error claim fails as he has not shown plain error occurred.

¶ 80                          Doctrine of Transferred Intent

¶ 81    In defendant's final claim of error, he asks this court to reverse his conviction for attempted murder. According to defendant, the doctrine of transferred intent as it exists in Illinois is illogical and inconsistent with other jurisdictions and asks that we disregard Illinois law in favor of the logic of other jurisdictions. The State maintains that Illinois law is well settled and argues defendant's contention is meritless.

¶ 82    The due process clause of the fourteenth amendment to the United States Constitution insures that an accused defendant is not convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). It is not, however, the function of this court to retry a defendant when reviewing whether the evidence at trial was sufficient to sustain a conviction. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our review is focused on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 83    The doctrine of transferred intent "applies when a third person is injured as a result of a defendant's assault upon another person." *People v. Valentin*, 347 Ill. App. 3d 946, 953 (2004). "It is well established that in Illinois the doctrine of transferred intent is applicable to attempted murder cases where an unintended victim is injured." *People v. Ephraim*, 323 Ill. App. 3d 1097, 1108 (2001).

¶ 84    Here, we see no reason to depart from Illinois precedent addressing the doctrine of transferred intent. We note that defendant only challenges the sufficiency of the evidence of his attempted murder conviction based on his view that the doctrine of transferred intent as applied in Illinois is outdated and illogical. Defendant admits that a criminal defendant in Illinois who did not intend to kill the victim can be convicted of attempted murder if the victim was struck by bad aim or mistaken identity. Notably, defendant has provided no argument, within the parameters of Illinois case law on the doctrine of transferred intent, whether the State presented sufficient evidence to convict him of attempted murder. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). It follows that defendant's argument fails because we see no reason to depart from Illinois precedent and because defendant failed to raise any argument challenging the sufficiency of the evidence within the parameters of Illinois law addressing the doctrine of transferred intent. Accordingly, we uphold defendant's convictions for first degree murder and attempted murder.

¶ 85                                    CONCLUSION

¶ 86            The judgment of the circuit court of Cook County is affirmed.

¶ 87            Affirmed.