# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2017 IL App (1st) 143766

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FREDRICK JONES, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-3766 |
| Filed | June 9, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-16965; Hon. James M. Obbish, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Manuel S. Serritos, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and David J. Welch, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1        After a bench trial, defendant Fredrick Jones was convicted of robbery and sentenced to 15 years' imprisonment. He raises three arguments on appeal. First, he contends that the circuit court erred by denying his motion to suppress the victim's identification testimony, which was based on a showup that defendant maintains was unduly suggestive. Second, he argues his attorney rendered ineffective assistance of counsel by failing—for purposes of perfecting impeachment—to have a third party present for a conversation she had with the victim in a hallway outside the courtroom. Third, he contends that the fines, fees, and costs order must be corrected to reflect pretrial credit. We affirm and correct the mittimus.

¶ 2                                            BACKGROUND

¶ 3        Defendant was charged by information with one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2012)) and one count of aggravated unlawful restraint (720 ILCS 5/10-3.1 (West 2012)). On September 27, 2013, a public defender filed a motion to suppress identification testimony on defendant's behalf. That attorney later withdrew from the case, and assistant public defender Kyan Keenan took over the defense.

¶ 4        On February 6, 2014, Keenan filed an amended motion to suppress. That motion, which was largely duplicative of the original motion to suppress, stated that at 10:51 a.m. on August 31, 2012, defendant was arrested at 6330 South Elizabeth Street in Chicago by Chicago police officers. The officers were responding to a 9-1-1 call that was placed at 10:45 a.m., reporting a " 'person with a gun' " near 720 West 68th Street. After the police arrested defendant, they transported him by police car back to the scene of the robbery and presented him to Sean Coleman, the robbery victim. Coleman identified defendant. The motion argued that Coleman's identification testimony should be suppressed because the showup was unduly suggestive, as the defendant was handcuffed during the showup and Coleman's identification was not independently reliable.

¶ 5        On April 7, 2014, the court held an evidentiary hearing on the motion. At the hearing, Coleman testified that at 10:45 a.m. on the morning of August 31, 2012, he was robbed by a man with a gun while he was near 720 West 68th Street in Chicago. After the robbery, Coleman called 9-1-1. When the police arrived, they asked Coleman if he could identify the robbers. Coleman stated that he could. Thereafter, Chicago police officer Kevin Connors drove Coleman to a location a few blocks away. Coleman testified that during the drive, Officer Connors asked what the robber had taken, but that he had no recollection regarding whether Officer Connors stated if, or where, Coleman's stolen wallet had been found.

¶ 6        Attorney Keenan then asked Coleman if he "recall[ed] being in court on February 26th of 2013?"[1] Coleman answered that he did, leading to the following colloquy:

>        "Q. Right. Do you remember having a conversation with me in the hallway?
>        A. Yeah.

---

[1]The report of proceedings of the April 7, 2014, hearing reveals that Keenan asked Coleman if he recalled being in court on *February 26, 2013*. As discussed below, it is apparent that the actual date counsel meant to refer to was February 6, 2014. The reference to February 26, 2013, is either a transcription error or a misstatement by counsel that went uncorrected.

Q. Do you remember that I asked you did the officer's [*sic*] say anything to you in route from the scene to where you made your identification?

A. Basically they just asked me what was taken from me. Something along those lines.

Q. Do you remember telling me during that conversation that the officer told you that your wallet had been found on the person that you were going to identify?

A. No. I don't recall telling you that.

Q. Do you remember telling me that the officer's [*sic*]—

THE COURT: Was somebody else present?

MS. KEENAN: No, Judge.

THE COURT: You're making yourself a witness.

MS. KEENAN: Judge, I realize that and if that becomes the situation, (Inaudible) not to do that. I didn't expect that the witness would answer the way he's answering.

\*\*\*

Q. Do you recall on February 26, 2014, when you had conversation with me outside the courtroom telling me that Officer Connors told you that this person that he was taking you to had been found inside that vehicle you had identified?

MS. COAKLEY [Assistant State's Attorney]: Objection.

THE COURT: Sustained."

¶ 7 Coleman later testified that when he arrived at the location where defendant was being detained, he identified the robbers' getaway vehicle. After that, the police took defendant out of a police car and displayed him to Coleman. Defendant was handcuffed. At that time, Coleman identified defendant as the man he saw driving the car. Coleman testified that he had never seen the man before.

¶ 8 On cross-examination, Coleman testified that 7 to 12 minutes passed between the time when he called 9-1-1 and the time when he was brought to 6330 South Elizabeth Street for the showup. Coleman stated that he was 25 feet from defendant when he identified him, the identification took place in daylight with "perfect lighting conditions," and he had a clear view of defendant during the showup. In addition, Coleman clarified that Officer Connors was the only person in the police car with him when he was driven to Elizabeth Street. Coleman testified that Officer Connors did not suggest to Coleman who he should identify.

¶ 9 After Coleman's testimony, defendant rested, and the State called Officer Connors. Officer Connors testified that on the morning of August 31, 2012, he went to 720 West 68th Street in response to Coleman's 9-1-1 call. While there, Officer Connors learned that a person matching a description that Coleman had given to the 9-1-1 dispatcher was being detained nearby by other police officers. Officer Connors told Coleman that a person had been detained and that they were going to go to the person's location. Officer Connors stated that he did not tell Coleman that money had been recovered from the person. Likewise, Officer Connors testified that he did not "tell [Coleman] who to pick out" during the drive.

¶ 10 Approximately 10 minutes after responding to Coleman's 9-1-1 call, Officer Connors and Coleman arrived at 6330 South Elizabeth Street. There, Officer Connors saw defendant sitting in the backseat of a police car. Another police officer took defendant out of the car, and

Coleman, still sitting in the police car, identified defendant. Officer Connors stated that he did not "tell [Coleman] to pick out the defendant before [Coleman] identified [defendant]."

¶ 11 The court denied defendant's motion to suppress, noting that the showup was "so close in time" and that it did not "seem like anything was done that was so suggestive by the officer's [*sic*] to create the likelihood of a misidentification ***."

¶ 12 On May 13, 2014, assistant public defender Elizabeth Payette appeared on behalf of defendant and filed a "motion to reopen motion to suppress identification." In pertinent part, the motion alleged that, before the February 6, 2014, hearing, Coleman was alone with defense attorney Keenan and told her that the police officer who transported him to defendant's location had told him that the suspect had been found in a car matching the description and license plate Coleman had provided and that Coleman's wallet was found in that car. The motion noted that defense counsel had tried to impeach Coleman during the last hearing with that information, but could not do so because she could not be both a witness and defendant's attorney. The court granted the motion and reopened the proofs on defendant's motion to suppress.

¶ 13 On June 5, 2014, the court held a hearing on the reopened motion to suppress. Keenan testified that on February 6, 2014, she appeared in court for a hearing on defendant's motion to suppress. Sometime between 10:30 and 11 a.m., Keenan asked Coleman if he was willing to speak to her. During her testimony, Keenan explained that she "wanted to ask him some questions about the circumstances of the identification that he made." Coleman agreed to talk to Keenan and they had a conversation in the hallway outside the courtroom. No one other than Keenan and Coleman was present for the conversation. During the conversation, Keenan asked Coleman to tell her what happened during the identification. Coleman told Keenan about the circumstances of the robbery and then what happened during the identification. In addition, according to Keenan, Coleman:

"Told me that a police officer came to pick him up and took him to another location and that he knew that my client was involved because the police officer told him that he found Mr. Coleman's wallet on Mr. Jones and that he had found him in the car with the license plate that he called into the police."

¶ 14 On further examination by the State and the court, Keenan testified that she did not (1) take notes during the conversation, (2) ask Coleman to sign an affidavit, (3) call an investigator to re-interview Coleman, (4) record the conversation with a smart phone, or (5) ask a partner or the assistant State's Attorneys to listen to Coleman's statement. Keenan explained that she did not send an investigator to speak to Coleman because her "understanding" was that the attorney who preceded her in representing defendant "asked several times for an investigator to speak with Mr. Coleman with no success."

¶ 15 The court again denied the motion to suppress. The court noted that, at the first hearing on the motion to suppress, both Coleman and Officer Connors denied the statement attributed to Coleman, and that it found both of those witnesses to be credible.

¶ 16 The case then proceeded to a bench trial. At trial, Coleman testified that around 10:45 a.m. on August 31, 2012, he was in the 700 block of West 68th Street driving a farm tractor to cut weeds on an empty lot. At that time, a silver Chevrolet Impala drove up and approached Coleman. Coleman told the driver that "he might not want to park" near the tractor because the tractor "tends to throw rocks or something out from underneath it sometimes." The car then pulled a few feet closer to Coleman and stopped.

¶ 17      Once the car stopped, a passenger exited the vehicle. The person did not close the car door, allowing Coleman to see into the car and observe the driver, whom Coleman later identified as defendant, sitting in the driver's seat. Coleman testified that the driver was wearing tan work boots, grey sweatpants, a white T-shirt, and glasses.

¶ 18      The passenger approached Coleman while holding a revolver and demanded Coleman's money. Coleman gave the person his wallet, which he testified contained $200, and the passenger returned to the car, which then drove away. Coleman watched the car as it drove away and memorized its license plate number. He then called 9-1-1 and gave the dispatcher a description of the driver, the gunman, the car, and its license plate number.

¶ 19      Two to five minutes later, Officer Connors arrived on the scene and spoke to Coleman. Approximately 5 to 10 minutes later, Officer Connors drove Coleman to 6330 South Elizabeth Street, where Coleman saw the person who drove the getaway car, accompanied by police officers. At that point, Coleman identified defendant as the getaway driver. Coleman also noticed that the car defendant had been driving was nearby. Afterwards, the police returned Coleman's wallet, which by that time contained only $3.

¶ 20      On cross-examination, Coleman stated that he had between $202 and $204 in his wallet when he was robbed. He testified that the tractor he was riding sat four to five feet above the ground. He explained that when he was robbed, the car defendant was driving was approximately 30 feet away.

¶ 21      Sergeant Llowyn Clark testified that around 10:45 a.m. on August 31, 2012, she received a dispatch call reporting an armed robbery and license plate information for a vehicle involved in the robbery. In response, Sergeant Clark drove to 68th Street and Morgan Street, where she saw a car with a matching license plate stopped at a stop sign. At that point, the car turned left onto Morgan Street and began driving south. Sergeant Clark made a U-turn and got behind the car, at which point she saw an unmarked police car driven by Officers Tamiko Mitchell and Marcus Williams pull in front of the car and "put a stop on it."

¶ 22      Once the car stopped, the passenger door opened, and a person exited the car and began running. Sergeant Clark exited her car, and she and Officer Williams began chasing the passenger. At this point, the driver was still inside the car and Officer Mitchell was by the car's driver's side. As Sergeant Clark was pursuing the passenger, she heard Officer Mitchell state over the radio that the car the police had stopped was attempting to flee. Sergeant Clark returned to the scene of the traffic stop and saw that the getaway car and Officer Mitchell's police car were gone. Sergeant Clark found Coleman's wallet on the ground in the area where the passenger door of the getaway car had been.

¶ 23      Officer Mitchell testified that once the getaway car stopped, he and Officer Williams approached the car and ordered the occupants to put their hands up. After the passenger exited the car and fled, Sergeant Clark and Officer Williams gave chase, and Officer Mitchell approached the driver's side door of the getaway car. As he did so, Officer Mitchell saw a person whom he identified as defendant sitting in the driver's seat. At that point, Officer Mitchell saw defendant look in his rear-view mirror. The car then drove away. Officer Mitchell "jumped back" to avoid being hit by the car, and then radioed that defendant had fled. Shortly thereafter, Officer Williams returned from chasing the passenger and got into the police car. The officers then received a dispatch regarding an incident in the 6300 block of South Elizabeth Street. There, Officer Mitchell saw defendant in police custody and defendant's car parked in an alley nearby.

- 5 -

¶ 24   Officer Jerome Booker testified that he became involved in a vehicular chase in the 6700 block of Morgan Street. According to Officer Booker, the car that the police were pursuing eventually drove into an alley near Elizabeth Street. Once inside the alley, the driver abandoned the car and ran onto Elizabeth Street. There, Officer Booker saw the driver, who he identified in court as defendant, run onto the porch of a building at 6330 South Elizabeth Street. Officer Booker detained defendant, at which point Officer Mitchell arrived and identified defendant as the person driving the vehicle that had been stopped earlier. Officer Booker handcuffed defendant and placed him in the back of a police car. Three to five minutes later, Officer Connors and Coleman arrived at the scene. Officer Booker removed defendant from the police car and presented him to Coleman, who made a positive identification. Officer Booker searched defendant and recovered $197.

¶ 25   The State rested its case and defendant moved for a directed verdict. The court granted the motion with respect to the aggravated unlawful restraint charge. After defendant rested his case, the court found him guilty of robbery and sentenced him to 15 years' imprisonment and three years of mandatory supervised release. This appeal followed.

¶ 26                                         ANALYSIS

¶ 27   Defendant first contends that the circuit court erred by denying his motion to suppress Coleman's identification testimony because the showup from which Coleman's identification testimony was procured was unduly suggestive. Criminal defendants have a due process right to be free from identification procedures that are "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds*, *Griffith v. Kentucky*, 479 U.S. 314 (1987); see U.S. Const., amend. XIV. The Illinois Supreme Court "has approved prompt showups near the scene of the crime as acceptable police procedure designed to aid police in determining whether to continue or to end the search for the culprits." *People v. Lippert*, 89 Ill. 2d 171, 188 (1982). Pretrial identifications, such as the showup conducted in this case, implicate the due process clause only when the identification procedure was so "unnecessarily suggestive" or "impermissibly suggestive" that there exists "a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994).

¶ 28   Illinois courts use a two-part test to determine whether an identification procedure comports with due process. First, "the defendant must prove that the confrontation was so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process of law." *Id.* at 797. That analysis "involves an inquiry into both the suggestiveness of the identification and the necessity of the suggestive identification." *People v. Follins*, 196 Ill. App. 3d 680, 688 (1990). Second, if the defendant establishes that the confrontation was unduly suggestive, the burden shifts to the State to demonstrate that, "under the totality of the circumstances, the identification *** is nonetheless reliable." *Moore*, 266 Ill. App. 3d at 797. To make that determination, courts consider " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *People v. Manion*, 67 Ill. 2d 564, 571 (1977) (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

¶ 29   The circuit court's factual determination that an identification procedure was not unduly suggestive will not be reversed unless it is against the manifest weight of the evidence. *People*

*v. Moore*, 2015 IL App (1st) 141451, ¶ 16. The court's ultimate decision to grant or deny a motion to suppress is reviewed *de novo*. *Id.*

¶ 30   Defendant maintains that his showup was unduly suggestive because he was "obviously in custody, as he was handcuffed and hauled from the back of a squad car." This argument lacks merit. To begin, defendant has failed to cite a single case in which this court or the Illinois Supreme Court has held that a showup identification was *ipso facto* unduly suggestive by sole virtue of the fact that the defendant was in police custody during the showup. In fact, due to the nature of showup identifications—which are typically conducted in a police station or in public after a suspect has been stopped by the police—it is difficult to imagine how the police could ever conduct a showup identification, while masking the fact that the suspect is in custody. Accordingly, we do not think that the fact that defendant was handcuffed and "obviously" in police custody is evidence enough, standing alone, for a defendant to carry his burden of establishing that the identification procedure was *unduly* suggestive. See *People v. Tyler*, 28 Ill. App. 3d 538, 540 (1975) (finding that the defendant's showup was not unduly suggestive where the defendant was arrested at a roadblock, taken from his vehicle at gunpoint, placed in handcuffs, surrounded by police officers, and then identified by a victim).

¶ 31   We do not believe that *People v. Lee*, 44 Ill. 2d 161 (1969), or *People v. Wright*, 126 Ill. App. 2d 91 (1970), require a different outcome. Both cases are factually distinguishable because the showups in those cases were conducted while the accused was handcuffed to another suspect. *Lee*, 44 Ill. 2d at 168; *Wright*, 126 Ill. App. 2d at 94. Defendant's citation to *People v. Carroll*, 12 Ill. App. 3d 869 (1973), is equally unavailing. True enough, in *Carroll*, this court found that a showup conducted while the defendant was handcuffed and standing between two police officers was unduly suggestive. *Id.* at 874. Nonetheless, we find *Carroll* unpersuasive for two reasons.

¶ 32   First, *Carroll* is distinguishable, insofar as the court explained that the suggestive showup was "compounded" because the defendant was identified a second time by the same witness while the defendant was handcuffed and sitting alone on a bench at the police station. *Id.* No such aggravating circumstances are present in this case.

¶ 33   Second, subsequent decisions from this court have made clear that the court in *Carroll* did not establish a rule that a showup in which the accused is handcuffed when shown to the witness is *per se* unduly suggestive. See *People v. Howard*, 376 Ill. App. 3d 322, 332 (2007) (explaining that *Carroll* did not establish a "bright-line rule that the presentation of a suspect to witnesses while flanked by police automatically calls an identification into question"). On that point, we find it noteworthy that defendant has not explained *why* the fact that he was handcuffed and in the presence of police officers rendered his showup unduly suggestive. Defendant's argument carries the unmistakable implication that a showup is unduly suggestive—and therefore violates a defendant's due process rights—whenever the accused is handcuffed and in police custody.

¶ 34   In this respect, defendant's argument is doubly flawed. First, the Supreme Court in *Stovall* explicitly forbade the type of *per se* rule that defendant now advocates, stating instead that "a claimed violation of due process of law in the conduct of a confrontation *depends on the totality of the circumstances* surrounding it." (Emphasis added.) *Stovall*, 388 U.S. at 302. Moreover, as we have explained, whether the procedure takes place in public or at the police station, due to the nature of a showup, the accused will almost always be, or appear to be, in police custody.

¶ 35    We have reviewed the transcript of the suppression hearings as well as the trial transcript, and find, based on the totality of the circumstances, that the circuit court's determination that defendant's showup was not unduly suggestive was not against the manifest weight of the evidence. *People v. DeLuna*, 334 Ill. App. 3d 1, 11 (2002) ("Because defendant asks that we review the trial court's decision on the motion to suppress, we may consider not only the evidence presented at the suppression hearing, but also that introduced at trial.").

¶ 36    First, the record shows that Coleman, while in broad daylight, had the opportunity to observe defendant while he was sitting inside the car. See *Manion*, 67 Ill. 2d at 570 (finding that showup was not unduly suggestive even though the witnesses viewed the defendant while he was alone inside a police car wearing handcuffs because the witnesses had a prior opportunity to view the defendant and the showup facilitated the police's search for the suspects). Second, after the robbery, defendant and his accomplice absconded from the crime scene and then fled from the police after the police attempted to stop them. Defendant's accomplice actually escaped and defendant himself almost struck a police officer with the car he was driving when he fled. See *People v. Thorne*, 352 Ill. App. 3d 1062, 1077 (2004) (rejecting the defendant's argument that an immediate showup near the crime scene was unduly suggestive because "the police were in hot pursuit of the suspected perpetrators a short time after the robbery"); *People v. Johnson*, 262 Ill. App. 3d 781, 792 (1994) ("In the instant case, the evidence established that the police began their pursuit of the fleeing offenders immediately and returned to the scene with both defendant and [his accomplice] only minutes after the beating took place. Because the police would have released them and continued their search if they could not be identified, the identification procedures were appropriate.").

¶ 37    We also find that, under the circumstances, the police had ample reason to conduct a showup, as opposed to waiting to assemble a multi-person lineup or photographic array at the police station. Put simply, the police in this case had to respond to an armed robbery conducted in broad daylight during which time Coleman had ample opportunity to observe defendant. Moreover, defendant and his accomplice fled from the crime scene and the place where they were stopped by the police. Defendant's accomplice actually escaped. When defendant fled in the car, he nearly struck an officer and led the police on a car chase through the streets of Chicago. Under these circumstances, we are loathe to second-guess the police's decision to conduct a showup as opposed to some different identification procedure.

¶ 38    Moreover, even assuming that defendant's showup was unduly suggestive, he would still not be entitled to relief because Coleman's identification was independently reliable. First, Coleman had ample opportunity to observe defendant. As noted, the robbery took place in broad daylight, and Coleman was able to view defendant in the car because his accomplice left the passenger side door open. Second, Coleman displayed a high degree of attention and provided an accurate, detailed description of the suspects to the police. See *People v. Gabriel*, 398 Ill. App. 3d 332, 342 (2010) (finding eyewitness identification of the defendant reliable even though the defendant was pointing a gun at the witness). Coleman was able to provide a description of (1) defendant, (2) defendant's accomplice, (3) the car defendant was driving, and (4) the car's full license plate number. Third, Coleman displayed a high degree of certainty when identifying defendant. Finally, the identification took place within 7 to 12 minutes after the crime took place. For these reasons, we find that the circuit correctly denied defendant's motion to suppress.

¶ 39    We next consider defendant's argument that Keenan rendered ineffective assistance of counsel by failing to have a third party witness her conversation with Coleman. In defendant's view, had a third party witnessed the conversation, that person could have impeached Coleman's testimony by testifying consistently with Keenan's version of the February 6, 2014, conversation.

¶ 40    When evaluating an ineffective assistance of counsel claim, this court applies the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Under *Strickland*, a defendant claiming ineffective assistance "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

¶ 41    "*Strickland*'s first prong sets a high bar." (Internal quotation marks omitted.) *Buck v. Davis*, 580 U.S. ___, ___, 137 S. Ct. 759, 786 (2017). To meet it, "the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *Evans*, 186 Ill. 2d at 93. In so doing, "the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "Because effective assistance refers to competent and not perfect representation, mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43.

¶ 42    To demonstrate prejudice, the defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The fundamental concern underlying this test is 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *People v. Potthast*, 219 Ill. App. 3d 714, 720 (1991) (quoting *Strickland*, 466 U.S. at 686).

¶ 43    During the renewed suppression hearing, Keenan testified that defendant's previous attorney tried on multiple occasions to have an investigator speak with Coleman, without success. In addition, Keenan testified that at the time of the conversation, she had no colleagues nearby to witness the conversation. In light of the apparent difficulty that the defense was having in speaking to Coleman, coupled with the fact that no one was actually present to witness the interview, we are unable to conclude that Keenan's decision to interview Coleman alone was objectively unreasonable.

¶ 44    Defendant also suggests that Keenan's performance was deficient because she did not send an investigator to obtain a corroborating statement from Coleman after the February 6, 2014, interview. This claim is baseless. This court has explained repeatedly that the failure to perform an act of futility does not constitute ineffective assistance. See *People v. Ivy*, 313 Ill. App. 3d 1011, 1018 (2000). In Illinois, it is well established that a witness for the State, such as Coleman, "need not grant an interview" to the defense unless the witness chooses to do so of his own volition. *People v. Peter*, 55 Ill. 2d 443, 451 (1973); see *People v. Goff*, 137 Ill. App. 3d 108, 112 (1985) (circuit court properly tendered non-Illinois Pattern Jury Instructions, stating " '[a]ny witness in a criminal case is under no obligation to grant an interview to defendant or to counsel for defendant, or discuss with such defendant or defendant's counsel, what the testimony would be, unless the witness chooses to do so' "). We do not believe that Keenan performed deficiently by failing to send an investigator to request an interview with

Coleman, which Coleman had no obligation to grant. Defendant's argument to the contrary is entirely speculative, as it rests on the twin assumptions that, had Keenan sent an investigator, Coleman would have (1) agreed to be interviewed and (2) provided a statement corroborating Keenan's version of the facts.

¶ 45    Defendant also alleges that Keenan was ineffective specifically because she did not file an amended motion to suppress that specifically referenced her conversation with Coleman. This argument is unpersuasive. To begin, defendant's motion to reopen the motion to suppress was, in effect, such an amended motion. The motion to reopen, as noted, described Keenan's version of the February 6 conversation. While the circuit court faulted defendant's counsel for not addressing the issue earlier, the court did grant the relief defendant sought and did so before his trial. Accordingly, we cannot find counsel was ineffective for failure to specifically file an "amended" motion to suppress based on the hallway conversation.

¶ 46    Defendant's ineffective assistance claims fail for second a reason: he cannot demonstrate prejudice. When a defendant raises an ineffective assistance claim in the context of a motion to suppress evidence, the defendant must show that, but for counsel's errors, the motion to suppress would have been granted and that there exists a reasonable probability that the ultimate outcome at trial would have different had the evidence been suppressed. *People v. Sterling*, 357 Ill. App. 3d 235, 247 (2005). In this case, the record strongly suggests that the circuit court would have denied defendant's motion, even if Keenan had performed all the actions defendant criticizes her for not doing.

¶ 47    To begin, we have already found that, even if defendant's showup was unduly suggestive, Coleman's identification was nonetheless independently reliable. Moreover, defendant ultimately did have the opportunity to present evidence that impeached Coleman's testimony when Keenan withdrew and testified to the contents of her conversation with Coleman during the renewed hearing. Despite hearing the testimony of Keenan—a licensed attorney and officer of the court—the circuit court nonetheless rejected defendant's motion. In so doing, the court noted not only that it found Coleman's testimony credible, but also found credible the testimony of Officer Connors—who, notably, was not seriously impeached during the first suppression hearing. Based on these facts, we find it unlikely that the circuit court would have granted defendant's motion to suppress even if Keenan had (1) obtained the services of a "prover" to witness the February 6, 2014, conversation with Coleman, (2) sent an investigator to obtain a statement from Coleman after February 6, and (3) filed a motion to suppress containing allegations regarding the Coleman's statement during the February 6 conversation.

¶ 48    Furthermore, it is unlikely that the outcome at trial would have been different had Coleman's identification testimony been suppressed. Defendant was convicted of robbery under an accountability theory. A robbery occurs when a person "knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2014). A person is legally accountable for the acts of another person when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014).

¶ 49    Excluding Coleman's identification, the evidence at trial established that Coleman was robbed by a man who got into a car which drove away. Coleman viewed the car, memorized its license plate, and relayed that information to a 9-1-1 dispatcher. Within a few minutes, police

officers stopped a car with matching plates. Once the car stopped, the passenger fled. While Sergeant Clark and Officer Williams gave chase, Officer Mitchell approached the driver's side door and saw a person who he identified as defendant sitting in the driver's seat. Defendant fled in the car (almost striking Officer Mitchell in the process) and when Sergeant Clark returned, she found Coleman's wallet, far away from Coleman, on the ground near where the car defendant was driving was parked. Even without Coleman's identification testimony, the evidence summarized above would have been sufficient for a rational trier of fact to find defendant guilty of robbery under an accountability theory.

¶ 50    Finally, we consider defendant's argument that the fines, fees, and costs order must be corrected to reflect credit for time defendant served in pretrial custody. Defendant spent 805 days in pretrial custody, resulting in $4025 in pretrial credit.

¶ 51    Defendant contends that he is entitled to a time-served credit against the following assessments that were entered against him: a $10 mental health court fine pursuant to section 5-1101(d-5) of the Counties Code (55 ILCS 5/5-1101(d-5) (West 2014)), a $5 youth diversion/peer court fine pursuant to section 5-1101(e) of the Counties Code (55 ILCS 5/5-1101(e) (West 2014)), a $5 drug court fine pursuant to section 1101(f) of the Counties Code (55 ILCS 5/5-1101(f) (West 2014)), and a $30 children's advocacy center fine pursuant to section 5/1101(f-5) of the Counties Code (55 ILCS 5/5-1101(f-5) (West 2014)). The State concedes this point, and we agree. See *People v. Paige*, 378 Ill. App. 3d 95, 103 (2007) (holding that the $10 mental health court fee and $5 youth diversion/peer court fees are actually fines); *People v. Rexroad*, 2013 IL App (4th) 110981, ¶ 53 ($5 drug court fee is actually a fine unless the defendant actually participated in drug court); *People v. Butler*, 2013 IL App (5th) 110282, ¶ 4 ($30 children's advocacy center fee is a fine).

¶ 52    Defendant also contends that he is entitled to use his remaining pretrial credit to offset several assessments that he contends are fines, notwithstanding the fact that they are labeled as fees. Specifically, defendant claims he is entitled to an offset for the following assessments: a $15 State Police operations fee pursuant to section 27.3a(1.5) of the Clerks of Courts Act (705 ILCS 105/27.3a(1.5) (West 2014)); a $2 Public Defender Automation Fee pursuant to section 3-4012 of the Counties Code (55 ILCS 5/3-4012 (West 2014)); a $2 State's Attorney Records Automation fee pursuant to section 4-2002.1(a) of the Counties Code (55 ILCS 5/4-2002.1(a) (West 2014)); and a $50 Court Systems fee pursuant to section 5-1101(c) of the Counties Code (55 ILCS 5/5-1101(c) (West 2014)). The State concedes, and we agree, that the $15 State Police operations fee and the $50 court system fee are actually fines. See *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31 ("Despite its statutory label, the State Police operations assistance fee is *** a fine."); *People v. Smith*, 2013 IL App (2d) 120691, ¶ 21 (holding that the court systems "fee" is actually a fine). Accordingly, defendant is entitled to an additional $65 in pretrial credit.

¶ 53    Last, we consider defendant's claim that he is entitled to an offset against the $2 State's Attorney and $2 public defender records automation fees because those "fees" are actually fines. In a long and, until very recently, unbroken chain of cases, this court has squarely rejected the argument that the State's Attorney and public defender records automation fees are actually fines. See *People v. Taylor*, 2016 IL App (1st) 141251, ¶ 29; *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 65; *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 30; but see *People v. Camacho*, 2016 IL App (1st) 140604, ¶¶ 47-56 (holding that the State's Attorney and public defender records automation fees are actually fines). Although the *Camacho* court's analysis

of this issue has some persuasive value, we nevertheless decline defendant's invitation to digress from the weight of established precedent by classifying the records automation fees as fines.

¶ 54       Based on the foregoing, we find that defendant is entitled to $115 in pretrial custody credit. Defendant was assessed a total of $474 in fines and fees. Pursuant to our power under Illinois Supreme Court Rule 615(b)(1), we correct the mittimus to reflect $359 in fines, fees, and costs.

¶ 55                         CONCLUSION

¶ 56       We affirm defendant's conviction and correct the mittimus.

¶ 57       Affirmed; mittimus corrected.