NOTICE
Decision filed 10/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231104-U

NO. 5-23-1104

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 22-CF-1302 |
| | ) | |
| MINDY K. D'AMATO, | ) | Honorable |
| | ) | Matthew D. Lee, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Hackett* concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in denying the defendant's motion to suppress identification evidence and testimony. Therefore, the defendant's claims based upon plain error or ineffective assistance of counsel fail. The judgment of the trial court is affirmed.

¶ 2   After a jury trial, the defendant, Mindy K. D'Amato, was convicted of one count of disorderly conduct and one count of driving with a suspended or revoked license. The defendant was sentenced to 12 months of conditional discharge plus 180 days in the county jail. On appeal, the defendant claims that the trial court erred by denying the defendant's motion to suppress her

_____

*Justice Welch was originally assigned to the panel in this case. Justice Hackett was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

identification which would have left no substantive evidence upon which the defendant could be found guilty.

¶ 3                                    I. BACKGROUND

¶ 4     We only recite the facts necessary to our disposition. On September 30, 2022, Officer Sebastian Rivera and Officer Jordan Wells, who were employed by the City of Champaign, Illinois, were dispatched to the scene of a minor traffic accident. When the officers arrived on scene, they spoke to Xuerui Yang, one of the drivers involved in the accident. Yang reported that another driver had rear-ended his vehicle while he was waiting at a red light. Yang indicated that the driver was female and that she was driving a Dodge Dart. He told the officers that the female driver initially stayed at the scene and that she attempted to give Yang her insurance card. When Yang told the female driver that he wanted to contact the police, she left the scene. Yang described the individual as possibly being white or Hispanic, and he used his hand to indicate her height. Based on this information, the officers provided the dispatcher with a description of the female driver who had left the scene.

¶ 5     Approximately four hours later, the Champaign police department received a report of a stolen vehicle. The caller identified the vehicle as a Dodge Dart. This was the same model as the vehicle that had been involved in the Yang accident. Officer Rivera and Officer Wells heard the dispatch and suspected that the stolen Dodge Dart report could be connected to the Yang accident. The officers contacted Yang to see if he would be available to identify the caller that had made the stolen vehicle report. Yang indicated he was available. Officer Rivera and Officer Wells went to Yang's apartment to take him to the address of the female caller who reported her car stolen. Yang was seated in the back of the police car. Officer Rivera made contact with the female caller. She identified herself as Mindy D'Amato. As Officer Rivera walked with D'Amato from the residence

2

to the area where the Dodge Dart had allegedly been stolen, Yang was able to observe D'Amato. Based upon his observation of D'Amato, Yang identified her as the female driver who hit his car earlier that day.

¶ 6     Yang told Officer Wells that he was "80 percent sure" that D'Amato was the driver. Officer Wells then moved the patrol car to better illuminate the area where D'Amato was standing. Yang again confirmed to Officer Wells that D'Amato was the person who hit his car earlier in the day, and he increased his rate of certainty to, "90 percent." Officer Wells notified Officer Rivera that they "had a show-up,"[1] and Wells instructed Rivera to arrest D'Amato.

¶ 7     On October 3, 2022, the State charged the defendant, Mindy D'Amato, by information with one count of disorderly conduct under section 26-1(a)(4) of the Criminal Code of 2012 (720 ILCS 5/26-1(a)(4) (West 2022)). The State alleged that the defendant "knowingly transmitted to Officer Rivera, a police officer for the City of Champaign Police Department, a report that the offense of theft had been committed, knowing at the time of said transmission that there were no reasonable grounds to believe that such offense had been committed." Two weeks later, the State filed an additional count charging the defendant of driving while license revoked, in violation of section 6-303(a) of the Illinois Vehicle Code (625 ILCS 5/6-303(a) (West 2022)). In count 2, the State alleged that the defendant drove a motor vehicle on a public highway in Champaign County, Illinois, at a time when her license to drive was revoked due to a prior violation.

¶ 8     On May 15, 2023, the defendant filed a motion to suppress identification testimony based on unnecessarily suggestive identification procedures. The defendant asserted that the

---

[1]"A showing by police of a suspect standing alone, in what is often described as a 'show-up,' has been observed to carry with it a dangerous degree of improper suggestion." *People v. Blumenshine*, 42 Ill. 2d 508, 512 (1969).

identification of the defendant was unduly suggestive, unreliable, and violated her right to due process. The defendant's motion was called for hearing on June 26, 2023.

¶ 9    Defense counsel called Officer Rivera as the initial witness at the suppression hearing. Officer Rivera testified that he responded to a hit-and-run accident on September 30, 2022. When Officer Rivera arrived on scene, he spoke with Yang. Yang reported that he was involved in a hit-and-run accident with a Dodge Dart vehicle. Officer Rivera could not recall Yang's description of the other driver, and he had not had an opportunity to review his body camera footage of his initial contact with Yang. Defense counsel played the body camera footage to refresh Officer Rivera's recollection of the conversation. After reviewing the footage, Officer Rivera testified that Yang told him that the person who hit his car had "lighter-colored hair," was "White or Hispanic," and provided a size measurement "with his hand in the air." When Officer Rivera radioed his dispatcher, he advised that the suspect was "white," with "black hair," and he gave his estimate of what her height was based on Yang's hand gesture.

¶ 10    Officer Rivera testified that around four hours later, on that same day, he and Officer Wells were dispatched to a report of a stolen car. The description given by the dispatcher matched the description of the vehicle involved in Yang's hit-and-run accident. Officer Rivera testified that he and Officer Wells contacted Yang to see if he was available to identify the person who might have struck Yang's car. Officer Rivera then described the identification process. Officer Rivera made contact with the female caller and asked her to show him the area where the car had been stolen from. At that point, Yang was seated in the backseat of the police car. The police car was positioned so that its headlights would illuminate the female caller. As Officer Rivera and the female caller walked past the police car, he also used his flashlight to illuminate her. Officer Rivera recalled that

4

at some point during the identification process the officers either repositioned the police car or directed the female caller to a different position so that she would be more visible to Yang.

¶ 11    Defense counsel also called Officer Wells. Officer Wells did not initially recall the details from his first encounter with Yang. Officer Wells stated that he and Officer Rivera had received the report of a stolen vehicle from their dispatcher. He noted that a female had reported the vehicle stolen, but that the registered owner of the car was a male. This information caused Officer Wells to question whether there was any potential connection between the stolen vehicle report and Yang's earlier hit-and-run accident. Officer Wells and Officer Rivera went to Yang's apartment to ask whether Yang might be able to identify the driver involved in Yang's accident. When the officer arrived at Yang's apartment, they informed Yang that the Dodge Dart from his accident had been reported stolen. Yang told Officer Wells that he could identify the person who hit his car but wanted to know if Officer Wells could protect him. Officer Wells and Officer Rivera drove Yang from his apartment to the address of the female caller for a possible identification. As the officers drove to the female caller's address, Yang provided another description of the female driver that hit his car. This description was recorded on an in-car camera and was played for the court. After the in-car video was played, Officer Wells summarized Yang's description of the driver as, "Twenty to 35, not skinny, not fat, white female. Wasn't familiar with the hair, couldn't say on the hair." Officer Wells also testified that Yang described the woman as "162 centimeters tall."

¶ 12    When Officer Rivera, Officer Wells, and Yang arrived at the location of the female caller, Officer Rivera engaged with the female caller while Officer Wells observed. Yang remained in the backseat of the police car. The officers walked the female caller past the police car to the street in front of the residence, which was where the Dodge Dart had allegedly been stolen from. At that

5

point, the police car was parked with the headlights pointing towards the officers and the female caller. Officer Wells testified that when he returned to the police car, Yang told him that he was "80 percent sure" that the caller was the same female driver that hit his car four hours earlier. Officer Wells further testified that Yang had said that "from the outside it looked like her." Officer Wells stated that he moved the police car to a different spot so that Yang "would have an opportunity to see her face to tell us whether or not this was the person that he was interacting with during the accident." Defense counsel played another in-car video of the interaction between Officer Wells and Yang which was after the police car was repositioned to better illuminate the female caller. Yang told Officer Wells that he was now "90 percent sure" that it was the same female that hit his car. Officer Wells notified Officer Rivera that they had a "show-up." He instructed Officer Rivera to arrest and Mirandize[2] the defendant.

¶ 13    The State did not call any witnesses at the suppression hearing. At the close of the evidence, the trial court heard arguments from counsel. Defense counsel argued that Yang's identification of the defendant was suggestive and not independently reliable given Yang's weak initial description of the female driver who hit his vehicle, the officers' potential influence during the identification procedure, and Yang's poor view of the defendant at the show-up. More specifically, defense counsel argued that Yang's initial description was vague because Yang described the individual as possibly being white or Hispanic, and Yang used his hand to show how tall the individual was. Based on this information from Yang, police officers called into dispatch that they were looking for a woman who was white and about 5 feet to 5 feet 2 inches tall. Counsel noted that the officers described the suspect as having long black hair, although the record is not clear where this information came from. Counsel further argued that there were discrepancies between Yang's

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

6

original on scene description of the person who rear-ended him and the description that Yang gave as his identification of the caller who reported a stolen car.

¶ 14    In response, the State claimed that the show-up identification was not unduly suggestive. The State argued that the police officers were able to interview Yang a second time during the drive to the location of the caller who reported the stolen vehicle. As a result, Yang provided more details about the physical description of the driver who had rear-ended his vehicle, than he had at the time of his initial interview. The State concluded the argument by stating that the details provided by Yang matched the defendant and that the credibility of his identification should be left to the jury.

¶ 15    After considering the evidence and the arguments of counsel, the trial court denied the defendant's motion. In comments from the bench, the trial court stated that the central question in these types of cases is whether the identification was reliable, even where the identification was suggestive, citing *Neil v. Biggers*, 409 U.S. 188 (1972). The trial court used the factors identified in *Biggers* and considered the evidence as it was related to the various factors. Specifically, the trial court considered the amount of time that Yang had to view the defendant at the time of the car accident, the accuracy of Yang's prior description, and the amount of time between Yang's car accident and his subsequent identification of the defendant at the scene of the stolen vehicle. The trial court concluded that the identification was suggestive, but that under the totality of the circumstances the identification was reliable. Therefore, the trial court found that the defendant did not meet her burden to show that the pretrial identification was so impermissibly suggestive that it was unreliable.

¶ 16    The case subsequently proceeded to a jury trial. The jury found the defendant guilty of disorderly conduct and driving with a revoked license. Defense counsel filed a motion for a new

7

trial, and it was denied by the trial court. The defendant was sentenced to 12 months of conditional discharge and 180 days in jail. This appeal followed.

¶ 17                                II. ANALYSIS

¶ 18     On appeal, the defendant contends that the trial court erred when it denied the defendant's motion to suppress. The defendant claims that the identification was unnecessarily suggestive and if the trial court had properly granted the defendant's motion, the State's evidence would have been insufficient to find the defendant guilty. The defendant argues that the evidence supports her contention that the identification was unnecessarily suggestive, that Yang's identification was unreliable, and that the denial of her motion to suppress violated her right to due process. The defendant acknowledges that she forfeited her claim of error. She argues that this court should review her claim under the plain-error doctrine, or alternatively that her counsel's failure to preserve the error constituted ineffective assistance of counsel.

¶ 19     In response, the State agrees that the defendant forfeited her claims of error and argues that the defendant's claims should be reviewed only for plain error. The State maintains that the identification procedures were not suggestive and that if they were, the facts and evidence support the reliability of Yang's identification.

¶ 20                                A. Plain Error

¶ 21     The defendant urges this court to find that the trial court committed error under the plain-error doctrine. The defendant concedes that she failed to preserve the objection to the identification testimony that she sought to suppress, as she failed to include her claim in her posttrial motion. Therefore, the issue is forfeited. This court elects to review the forfeited issues raised by the defendant under the plain-error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). "The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider

8

unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Under both prongs, the burden of persuasion remains with the defendant. *Herron*, 215 Ill. 2d at 187. If the defendant fails to satisfy this burden, the procedural default must be honored. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). When presented with a claim of plain error, the relevant inquiry begins with whether an error occurred at all. *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 45. "[T]he failure of a defendant to show that error occurred at all defeats both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine." *Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 22    In the case at bar, the defendant makes a claim under both prongs of the plain-error doctrine. The defendant claims that the trial court committed a clear error in denying her motion to suppress evidence of Yang's identification. The defendant contends that the show-up identification was unduly suggestive and that under the totality of the circumstances, Yang's identification was not independently reliable.

¶ 23                              B. Show-up Identification

¶ 24    "Criminal defendants have a due process right to be free from identification procedures that are unnecessarily suggestive and conducive to irreparable mistaken identification." (Internal quotation marks omitted.) *People v. Jones*, 2017 IL App (1st) 143766, ¶ 27. However, "the admission of evidence of a showup without more does not violate due process." *Biggers*, 409 U.S. at 198. When a trial court is considering the permissibility of a show-up identification there are two steps, which are (1) whether the show-up identification was suggestive, and if so, then (2) the trial court must apply factors in evaluating the likelihood of misidentification that ultimately rest with the totality of the circumstances. *Biggers*, 409 U.S. at 198-99. Initially, the defendant must

9

show that the show-up identification was unduly suggestive. *Jones*, 2017 IL App (1st) 143766, ¶ 28. If the defendant establishes that the confrontation was unduly suggestive, the burden shifts to the State to demonstrate that, under the totality of the circumstances, the identification is nonetheless reliable. *Jones*, 2017 IL App (1st) 143766, ¶ 28.

¶ 25     In evaluating the reliability of an identification, a court considers the factors set forth in *Biggers*, 409 U.S. at 199. These factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

¶ 26     On review, the trial court's factual determinations and assessments of credibility will be reversed only if they are against the manifest weight of the evidence. *Jones*, 2017 IL App (1st) 143766, ¶ 29. The trial court's ultimate ruling on a motion to suppress is reviewed *de novo*. *Jones*, 2017 IL App (1st) 143766, ¶ 29.

¶ 27     In this case, the trial court initially found that the show-up identification was suggestive. The trial court then applied the *Biggers* factors as it considered whether the identification was reliable. First, regarding the opportunity for the witness to view the defendant at the time of the offense, the trial court determined that Yang spoke to the driver of the vehicle that hit his car for three minutes after the fact. The trial court found that this would have been enough time to "notice facial features." Second, the trial court found that Yang held a high enough degree of attention while speaking with the defendant to recognize her later, which goes to the witness's degree of attention. Third, the initial description given by Yang was found by the trial court to be consistent with the defendant's "height, general size, and body type," which goes to Yang's accuracy of his prior description. Fourth, the trial court found that Yang "indicated that he was 80 percent certain

10

she was the same person as the driver," when the defendant walked past the parked police car. The trial court further found that Yang stated he was "maybe 90 or a little more" percent certain regarding his level of certainty after police officers repositioned the police cars to shine more light on the defendant at the time of the identification. Finally, the trial court stated that a show-up identification "ideally would be within minutes," but the court also stated it did not "believe four-and-a-half hours is so long that it destroys the reliability of the confrontation." The trial court concluded that under the totality of the circumstances, the defendant did not meet her burden to show that the pretrial identification was so impermissibly suggestive that it was unreliable.

¶ 28    After thoroughly reviewing the record, we find that the trial court's factual findings were not against the manifest weight of the evidence and that the court did not error in denying the defendant's motion to suppress. Because there was no error, the defendant's plain-error claims under either prong do not require further consideration.

¶ 29                    C. Ineffective Assistance of Counsel

¶ 30    The defendant also argues that she received ineffective assistance of trial counsel. "The right to the effective assistance of counsel is guaranteed under both the federal and state constitutions." *Hensley*, 2014 IL App (1st) 120802, ¶ 46. To prove ineffective assistance of counsel, a defendant must show both deficient performance of trial counsel and that trial counsel's performance prejudiced him. *Hensley*, 2014 IL App (1st) 120802, ¶ 46. To establish prejudice, a defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Hensley*, 2014 IL App (1st) 120802, ¶ 46. "If prejudice is not shown, a court can dispose of an ineffective assistance of counsel claim without first determining whether counsel's performance was deficient." *Hensley*, 2014 IL App (1st) 120802, ¶ 46. "Similarly, the failure of a defendant to show that error occurred at all defeats

11

both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine." *Hensley*, 2014 IL App (1st) 120802, ¶ 47. In this case, the defendant's ineffective assistance of counsel claim is based on her trial counsel's failure to preserve her claim that the trial court erred in denying the motion to suppress. Given our finding that the trial court did not err in denying the motion to suppress, the defendant cannot establish she was prejudiced by trial counsel's failure to preserve that claim. Because the defendant did not establish prejudice, we need not decide whether counsel's performance was constitutionally deficient. Accordingly, we find that the defendant's ineffective assistance claim is without merit.

¶ 31                                   III. CONCLUSION

¶ 32    For the foregoing reasons, the trial court's judgment is affirmed.

¶ 33    Affirmed.