2025 IL App (1st) 231203-U

SIXTH DIVISION
May 9, 2025

No. 1-23-1203

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22 CR 60041 |
| LAMONT BOYD, | ) ) ) | The Honorable Ursula Walowski, Judge Presiding. |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The decision of the trial court is affirmed. The showup identification procedure was not unduly suggestive, and the eyewitness's identification of the defendant was independently reliable.

¶ 2                              I. BACKGROUND

¶ 3    Lamont Boyd was arrested and charged with possession of a stolen motor vehicle and aggravated unlawful use of a weapon based on an incident that occurred on the afternoon of January 15, 2022, in the parking garage of a residential condominium building located at 901 W.

Madison in Chicago. A man was seen in the parking garage of the building sitting in a black Ford Edge, which had been reported stolen the week before. The man started driving the Ford Edge out of the parking garage, refused a police officer's order to stop, and then abandoned the vehicle near the exit of the parking garage. A loaded firearm was found on the floor of the vehicle near the driver's seat. Police canvassed the area looking for the driver of the vehicle and saw Boyd. He was walking in an alley about a block away from 901 W. Madison, and matched a description provided by witnesses. When the police approached Boyd, he started running away. Police ran after him. When they caught him, they handcuffed him and brought him back to 901 W. Madison. A showup was conducted, and witness Richard Coleman positively identified Boyd as the person he had seen sitting in the Ford Edge in the parking lot about 30 minutes earlier.

¶ 4     Boyd filed a motion to suppress the identification. At the hearing on the motion, the State called Chicago Police Officer Laura Salgado, who testified that on January 15, 2022, she responded to the parking lot at 901 W. Madison based on a report of a suspicious person in a parking garage. When she arrived, a flash message went out, which directed officers to look for a black male offender wearing "a black hoodie, black pants[,] white shoes" and a ski mask. Officer Salgado remained on scene, but other officers who were canvassing the area detained a suspect who matched the description given. While Officer Salgado was standing in the lobby of the building, she spoke with witnesses Richard Coleman and Brian Wayne. She informed them that "officers had the offender and they were bringing him back for a showup" and asked if they would be able to make an identification. Wayne said he couldn't because he only got a glimpse of him, but Coleman confirmed that he could. A police officer stood next to Boyd during the showup. Boyd was handcuffed and standing about seven to ten feet away from Salgado and Coleman at the time. Coleman positively identified Boyd as the offender. Video footage from Salgado's body-

worn camera (BWC) was admitted into evidence that included Coleman's identification of Boyd in the showup, as well as Salgado's conversations with the witnesses before and after the showup identification.

¶ 5    Chicago Police Officer Olamide Odu Onikosi also testified. She stated that on January 15, 2022, she and her partner were touring in the vicinity of 901 W. Madison when they received a call about a suspicious person who had been sitting in a stolen vehicle. They found Boyd, who matched the description of the offender given over the radio, standing in an alley about a block away. As described in the flash message, Boyd was wearing "a black hoodie, black pants, and white shoes." When Officer Odu Onikosi and her partner approached Boyd, he started running away and led the officers on a foot chase. The officers caught him, handcuffed him, placed him in custody, and brought him back to 901 W. Madison to see if any witnesses could positively identify him. Boyd stood outside the building's front entrance and Coleman viewed him from inside the lobby through the glass doors. Several officers were standing near Boyd at the time of the showup, and one of the witnesses identified Boyd as the offender. Officer Odu Onikosi was also wearing a BWC that day. Video footage from her BWC was admitted into evidence by the defense.

¶ 6    Defense counsel argued that any identifications of Boyd as the offender obtained via the showup should be suppressed because they were made under suggestive circumstances. Defense counsel highlighted the fact that Boyd was transported to 901 W. Madison in a marked police vehicle, escorted towards the building in handcuffs, and that he was standing next to police officers during the showup. Defense counsel also noted that several witnesses were standing next to one another during the showup procedure.

¶ 7    After hearing testimony and argument and viewing the body worn camera (BWC) footage from Officers Odu Onikosi and Salgado, the court stated, "Obviously this is a showup so [Boyd]

was in custody, detained in handcuffs, brought to a door. So [defense counsel] if you're arguing to me that that in and of itself is suggestive and I should not allow that showup, that's not going to work[.]" When defense counsel continued to argue that the showup was unduly suggestive because Boyd was "in cuffs and being transported in a police vehicle with several officers", the court cut her off, saying, "That goes to the weight. For a showup identification to not be allowed, it would have to be something to the effect of what is the suggestiveness. If you're saying in and of itself the person in handcuffs being brought to a window and then the person saying yes, that that in and of itself is suggestive, that fails. Unless you have any other argument, I don't know what your argument is." Defense counsel responded, "Judge, the description that the officers had, which is a male black in a black sweater, they didn't have any other description about any facial features or anything else and so *** the officers bringing a black male back to the building in handcuffs I believe is suggestive under these circumstances." The court denied defense counsel's motion to suppress, stating,

> "All I saw is a very basic showup. I did not see anything in that video where the officers were in any way suggesting, saying anything. The officers outside with the defendant, basically took the defendant out of the car. He stood there. They didn't say a word and then they got a radio call positive and they put him back in the squad car. Other than him being in handcuffs and being shown to people inside the building, I don't see anything suggestive about that. Secondly, as far as what happened inside the building, I didn't hear anything from any police officer or anyone to say like, oh, that's got to be the guy or yes, that's the guy, right, I saw -- you could say yes or no. That's what I clearly heard in the video -- body-worn camera of Officer Salgado. She asked the person that's been stipulated to as Mr. Coleman so, you know, he'll just be there and you say yes or no. And Mr. Coleman,

as soon as defendant is seen in there says yeah, that's him. So I don't see anything suggestive about that."

¶ 8    At Boyd's bench trial, Thomas Arnold testified that on January 8, 2022, his black Ford Edge was stolen from a parking lot in Chicago. He called the police and reported the car stolen. He had not loaned his car to anyone or given anyone permission to drive it, and he did not own a gun. On January 15, 2022, he learned that his vehicle had been recovered by police.

¶ 9    Coleman testified that on January 15, 2022, he was living in a ten-floor condominium building located at 901 W. Madison. The first floor is the lobby, the parking garage is on the second and third floors, and the rest of the building consists of apartments and condominium units. When Coleman got home from work that day around 3 pm, a dark-colored Ford Edge was parked in his assigned parking spot. Car alarms on several of the vehicles surrounding the Ford Edge were going off. It was daylight, and lights in the parking garage further illuminated the area. Coleman noticed that an individual was seated in the Ford Edge that was parked in his assigned spot, and the car's engine was still running and the driver's side door was open. Coleman walked over to the car, got within three feet of the man seated in the driver's seat, and told him he was in his parking spot. When the man did not respond, Coleman explained to him that individuals are assigned specific spots. Coleman was looking "right at [the man's] face" during this interaction and there was nothing obstructing his view. He did not recognize the man as a resident or tenant of the building, and had never seen him before. The driver of the Ford Edge then closed the door and started to drive off. Before the driver pulled all the way out of the spot, however, he stopped the car, put it in park, and got out to look underneath the driver's seat for something. He then got back in the car and drove off. Coleman estimated that he observed the driver for "[a]t least a minute or two." Afterwards, Coleman parked in his assigned spot and started walking towards the elevators.

5

Several police officers, the building's security guard and another resident then entered the parking lot. When officers asked Coleman if he had seen anyone looking through other people's cars, he told them about his encounter with the man driving the Ford Edge parked in his parking spot. He provided the police with a general description of the man, but could not remember what he was wearing other than dark articles of clothing. He did not give a description of the driver's height, build, complexion, or any distinctive facial features, and could not describe the man's hair style because the man's hood was up. Afterwards, Coleman went down to the lobby, where a police officer told him that they "got the guy" and asked him if he could make an identification. Boyd was handcuffed during the showup and was escorted by a police officer. Coleman identified Boyd as the person that was parked in his parking spot about 30 minutes after their initial interaction in the parking garage.

¶ 10    Chicago Police Officer Juan Partida testified that on January 15, 2022, he was working patrol with his partner when they got a call around 3 pm about a suspicious person in the parking garage of the building located at 901 W. Madison. They went to the lobby of the building, spoke to a security officer and a resident, and then proceeded to the parking lot. There, a witness told Officer Partida that someone driving a Ford Edge who had been parked in his parking spot drove up to the third floor of the parking garage. Officer Partida then saw a Ford Edge matching the description coming back down. He ordered the driver of the vehicle to stop, but the driver continued past him. When Officer Partida ran the vehicle's information, he discovered that it had been stolen. He sent out a flash message that gave a description of the vehicle as well as the driver. Officer Partida said he "had a good plain view sight of the actual driver and the vehicle passing," but admitted that he only observed the driver for maybe 10-15 seconds, "c[ould not] recall" if the driver was wearing a hood, and admitted that he did not observe the height, build, body weight, or

any distinctive facial features of the driver. Partida continued to pursue the driver on foot, but lost sight of the vehicle. He then found that the driver had abandoned the vehicle near the exit of the parking garage. The driver's side door was open and the vehicle was still running. When Partida looked inside, he saw a firearm laying on the driver's side floor. Chicago Police Officer Hannon recovered and inventoried the loaded firearm. Video footage from Officer Hannon's and Officer Partida's BWCs were admitted into evidence. Officer Partida identified Boyd in open court, but never did so prior to trial.

¶ 11    Chicago Police Officer Damilola Okunga testified that on January 15, 2022, after he and his partner Officer Odu Onikosi received a call about a suspicious person—who was described as a black male in all black with white gym shoes—they canvassed the area near 901 W. Madison looking for a suspect. They saw an individual matching the description in an alley about a block away, but the individual ran away. Officer Okunga gave chase and caught up to the man, handcuffed him, and placed him in custody. Okunga and his partner then escorted the individual to 901 W. Madison for a showup. Video footage from Okunga's BWC was admitted into evidence.

¶ 12    Chicago Police Officer Laura Salgado testified that on January 15, 2022, she and her partner responded to a call about a suspicious person at 901 W. Madison. She spoke with witness Richard Coleman and informed him that they "got the guy." She then conducted a showup in the lobby of the building, where Coleman positively identified Boyd as the individual he had seen in the parking lot earlier that afternoon.

¶ 13    Video footage from Salgado's BWC was admitted into evidence. On this video, a police officer asked residents in the lobby if anyone would be able to identify the driver of the Ford Edge. Although several witnesses said they would be unable to do so, Coleman confirmed that he could because the man was "parked in [his] spot" and he "went right up to him." Just before the showup,

Officer Salgado informed Coleman that officers were going to take the suspect out of the police car and that he would then indicate whether he could identify the suspect by "say[ing] yes or no." Boyd was presented in the showup, and Coleman immediately stated, "yeah, that's him."

¶ 14    The parties stipulated that Boyd did not possess a valid firearm owners identification card or a concealed carry license on or before January 15, 2022. The State presented a certification of vehicle records to prove that Thomas Arnold was the owner of the Ford Edge and then rested its case. The defense presented no witnesses or evidence.

¶ 15    After closing arguments, the court found that the State had proven Boyd guilty of possession of a stolen motor vehicle and aggravated unlawful use of weapon. The court noted that it "paid attention to not only what [the witnesses] had to say, but how they said it, their demeanor in court, the reasonableness of their testimony in light of all the evidence in the case." The court acknowledged that Coleman's identification of Boyd was obtained using a showup and that police were standing around him at the time, but found Coleman's testimony "very persuasive" and his identification of Boyd reliable because "there was an interaction" and Coleman "had absolutely no hesitation identifying Mr. Boyd." The court noted that it didn't "see anywhere in this process where [Coleman] was told you need to identify him or this is the guy, right. There was no such thing." The court stated that it "believed Mr. Coleman's identification" and "d[id]n't think it was suggested to him," and instead "f[ou]nd that he identified Mr. Boyd because that's who he saw." The court acknowledged that Officer Partida's identification of Boyd was not "as great," but nevertheless found Coleman's identification with the corroboration was sufficient to prove Boyd guilty beyond a reasonable doubt.

¶ 16    Boyd filed a motion to reconsider, arguing that the State failed to prove him guilty beyond a reasonable doubt. He alternatively moved for a new trial, arguing that the trial court erred when

it failed to suppress Coleman's identification that was obtained using a showup. The court denied Boyd's motion and sentenced him to concurrent terms of 3 years on the possession of a stolen motor vehicle count and 1 year for the aggravated unlawful use of a weapon count. Boyd timely appealed.

¶ 17                                    II. ANALYSIS

¶ 18    Boyd argues that the trial court erred when it denied his motion to suppress Coleman's identification. He argues that the showup procedure was unduly suggestive, that Coleman's identification was not independently reliable, and that its admission at trial violated his due process rights. He also argues that his trial counsel was ineffective.

¶ 19                A. The Showup Was Not Unduly Suggestive

¶ 20    Suppression motions generally present mixed questions of law and fact. *People v. Leanos*, 2023 IL App (1st) 191079, ¶ 29. When reviewing a trial court's ruling on a motion to suppress, we uphold the trial court's factual determination that an identification procedure was not unduly suggestive unless it is against the manifest weight of the evidence. *People v. Moore*, 2015 IL App (1st) 141451, ¶ 16. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *People v. Best*, 223 Ill. 2d 342, 350 (1996). We review the trial court's ultimate determination on a motion to suppress *de novo*. *People v. Clifton,* 2019 IL App (1st) 151967, ¶ 61.

¶ 21    "Criminal defendants have a due process right to be free from identification procedures that are unnecessarily suggestive and conducive to irreparable mistaken identification." *People v. Jones*, 2017 IL App (1st) 143766, ¶ 27 (internal quotations and citations omitted); U.S. Const. amend. XIV. "Although one person showups are inherently suggestive [Citation] and not favored as a means of identification, they are justified under limited circumstances, such as when a witness

had an excellent opportunity to observe the offender during the commission of the offense or prompt identification is necessary for the police to determine whether or not to continue their search." *People v. Hughes*, 259 Ill. App. 3d 172, 176 (1994); *People v. Lippert,* 89 Ill. 2d 171, 188 (1982) (approving "prompt showups near the scene of the crime as acceptable police procedure designed to aid police in determining whether to continue or to end the search for the culprits"); *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003) ("Illinois courts have long held that an immediate showup identification near the scene of the crime is proper police procedure" and have "consistently upheld [showup procedures] when they are justified by the circumstances"). "Courts must look to the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification." *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. Only when a showup is so "impermissibly suggestive" that it produces "a very substantial likelihood of irreparable misidentification" will evidence of any subsequent identification be excluded under the due process clause. *Ramos,* 339 Ill. App. 3d at 897 (quoting *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994)).

¶ 22    To determine whether an identification procedure comports with due process, Illinois courts employ a two-part test. First, the defendant must prove that the confrontation was "so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process of law." *Moore,* 266 Ill. App. 3d at 797. This part of the test requires an inquiry into both the suggestiveness and necessity of the identification. *People v. Follins*, 196 Ill. App. 3d 680, 688 (1990). If the defendant satisfies the first part of the test, then the burden shifts to the State to prove that "under the totality of the circumstances, the identification, made under suggestive circumstances, is nonetheless reliable." *Moore,* 266 Ill. App. 3d at 797.

¶ 23    Boyd argues that the showup here was unnecessarily suggestive because 1) he was in handcuffs and "surrounded by police" during the showup; 2) police told Coleman that they "got the guy" before the showup; and 3) police had Coleman identify Boyd in front of other residents "after just learning that the offender brought a gun into their condo building."

¶ 24    As to the first factor, the trial court found the fact Boyd was handcuffed and in custody insufficient to demonstrate any undue suggestiveness. We find no error, as we have repeatedly concluded that handcuffing a defendant and presenting him to a witness with police present, without more, is insufficient to make a showup identification procedure unduly suggestive. See, *e.g., Jones,* 2017 IL App (1st) 143766, ¶¶ 11, 30 (when the defendant was taken out a police car in handcuffs and displayed to a witness for a showup, the court found "the fact that defendant was handcuffed and 'obviously' in police custody [was not] evidence enough, standing alone, for a defendant to carry his burden of establishing that the identification procedure was *unduly* suggestive[,]" reasoning that "due to the nature of showup identifications—which are typically conducted in a police station or in public after a suspect has been stopped by the police—it is difficult to imagine how the police could ever conduct a showup identification while masking the fact that the suspect is in custody") (emphasis in original); *Hughes*, 259 Ill. App. 3d at 177-78 (finding that a showup was not unnecessarily suggestive even though defendant was escorted by a police officer because the witnesses had an excellent opportunity to view the defendant, expressed "complete certainty" in their identifications, and the identification took place less than 20 minutes after the crime was committed).

¶ 25    Boyd argues that police, indicating that they "got the guy" before the showup occurred, made it unduly suggestive. However, the trial court disagreed after hearing evidence and viewing the BWC video footage from Officers Salgado and Odu Onikosi at the suppression hearing. The

trial court stated it "d[id]n't see anything suggestive" about Officer Salgado's comments to Coleman because the officer did not say "oh, that's got to be the guy or yes, that's the guy."

¶ 26    After independently viewing the BWC video footage, we find that the police officers' comments did not render the showup *unduly* suggestive. See *People v. Rodriguez,* 387 Ill. App. 3d 812, 831 (2008) ("if a show-up could be invalidated on the ground that the police indicated that they had found a suspect, then no show-up could pass muster"). Although Officer Salgado told the building's residents that the police "had him" before the showup took place, this comment, taken in context, indicates that Officer Salgado was stating that the police had found a suspect who matched the description provided by witnesses on scene. As the trial court noted, Officer Salgado indicated it would be up to Coleman to "say yes or no" when Coleman was asked if he could identify the man in the showup. See *People v. Hughes*, 259 Ill. App. 3d 172, 176 (1994) (noting that one person showups, while disfavored, are justified when a witness on scene had an "excellent opportunity" to view the suspect). Furthermore, when several other witnesses indicated that they would be unable to make an identification, Officer Salgado immediately moved on to other witnesses.

¶ 27    Boyd also argues that the showup was unduly suggestive because Coleman was "asked to identify [Boyd] while standing in front of his co-residents after being told that the offender brought a firearm inside their condo." He argues that the presence of other building residents must have pressured or influenced Coleman to identify the person presented by police as the offender. For support, Boyd cites *In re T.B.* for the proposition that two witnesses simultaneously identifying a suspect may unduly influence each other. 2020 IL App (1st) 191041, ¶¶ 57-58 (finding the fact that two witnesses who identified the defendant were together during a showup procedure was a "bas[i]s for concern" but nevertheless finding it "hard to imagine that the two witnesses'

identifications, so immediately after the attack, could have been so tainted that we could not find their identifications reliable"). However, unlike *T.B.*, Coleman was the only witness to identify Boyd as the driver of the Ford Edge before trial, and nothing in the record indicates that Coleman felt pressured or influenced by other individuals to make an identification. See also *Rodriguez,* 387 Ill. App. 3d at 832 (finding that "simultaneous viewing" of the defendant by three witnesses - one of whom did not identify the defendant as the shooter - was not enough find the showup unnecessarily suggestive, reasoning that "if defendant's argument is that one of the identifying witnesses might have felt pressured to identify because another witness was also identifying defendant, then he would have felt equally pressured not to identify, because one of the witnesses *also* chose *not* to identify") (emphasis in original).

¶ 28    We also find that the prompt showup—which was conducted about 30 minutes after Coleman first saw the man in his parking spot—was necessary here so that police could determine whether Boyd—who fled from the scene and later, when confronted, led police on a foot chase— was the man who had been driving the stolen Ford Edge, or if police needed to release him and continue their search for other suspects. See *Jones*, 2017 IL App (1st) 143766, ¶ 37 (finding that "police had ample reason to conduct a showup, as opposed to waiting to assemble a multi-person lineup or photographic array at the police station" because the police "had to respond to an armed robbery conducted in broad daylight during which time [the witness] had ample opportunity to observe defendant" and defendant "fled from the crime scene and the place where [he was] stopped by the police"); *People v. Johnson,* 262 Ill. App. 3d 781, 792 (1994) (concluding that showups are "appropriate in situations involving a fleeing offender" because they "facilitate the immediate release of an innocent suspect and allow the police to continue their search for a fleeing offender"); *Hughes*, 259 Ill. App. 3d at 196 (reasoning that "[p]rompt identification procedure insures

accuracy by fostering the desirable objectives of fresh, accurate identification that may facilitate the immediate release of an innocent suspect as well as enabling the police to resume their search for the offender"); *People v. Thorne*, 352 Ill. App. 3d 1062, 1077 (2004) (finding that a showup identification near the scene of the crime was proper where police were in "hot pursuit" of suspected offenders who fled from the scene of the crime a short time after the robbery); *Cf. People v. Lee*, 44 Ill. 2d 161, 169 (1969) (finding no circumstances to "justify[] the unusually suggestive" identification procedure employed where the defendant "had been arrested and in custody for more than a month prior", had been handcuffed to an individual who had already been identified as having committed a crime, and the State offered no evidence to explain "why the defendant was not viewed in a properly conducted lineup at an earlier date").

¶ 29 Accordingly, we find the trial court's determination–that the showup procedure employed here was not unduly suggestive–was not against the manifest weight of the evidence.

¶ 30                    B. Coleman's Identification of Boyd was Reliable

¶ 31 Boyd argues that even if this court finds that the showup was not unduly suggestive, Coleman's identification still should have been suppressed because it lacked an independent basis and therefore was unreliable. To determine whether an identification is reliable, courts consider the totality of the circumstances, including " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *People v. Manion*, 67 Ill. 2d 564, 571 (1977) (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). Courts also consider "whether the witness was acquainted with the suspect before the crime, and whether there was any pressure on the witness to make a certain identification." *People v. Brooks,* 187 Ill. 2d 91, 130 (1999).

¶ 32    First, Boyd argues that because Coleman told Officer Salgado that he didn't think "much of" his encounter with Boyd in the parking lot, this means that his degree of attention was low. However, Boyd's argument is contradicted by the fact that Coleman was able to accurately describe the color, make and model of the car Boyd was driving and even pointed the actual car out to Officer Partida when they were together in the parking lot. In addition, Coleman testified that he looked "right at [Boyd's] face" when he asked him to move out of his assigned parking spot, and provided a general physical description of Boyd to police that matched Boyd's appearance on the day at issue. This factor weighs in the State's favor.

¶ 33    Second, Boyd argues that because Coleman's opportunity to view the offender was "brief," this renders his identification of Boyd unreliable. However, Coleman testified that he saw Boyd for one to two minutes, and we have deemed identifications reliable in cases where witnesses have observed suspects for much shorter periods of time. See, *e.g., People v. Macklin,* 2019 IL App (1st) 161165, ¶ 30 (finding that the witness had a "sufficient opportunity to observe" the defendant during the robbery, even though it only lasted for "seconds"); *People v. Rodriguez,* 134 Ill. App. 3d 582, 589-90 (1985) (finding the eyewitness's identification "sufficiently reliable" even though he "saw the face of the person who carried the gun for only a couple of seconds") *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006) (rejecting defendant's argument that the "brevity of the witness's observation undermines his identification testimony"). Moreover, Coleman was in an excellent position to view the offender. Coleman testified that he saw Boyd from approximately three feet away, during the daytime, in a well-lit parking garage. He spoke directly to Boyd, looked "right at his face," and there was nothing obstructing his view. He also watched Boyd get out of his vehicle and look underneath the seat before getting back in the vehicle and driving off. This factor overwhelmingly favors the State.

¶ 34    Third, Boyd argues that Coleman's prior description of the offender was "nonexistent," which weighs against the reliability of his identification. The record reveals that Coleman provided the correct color, make and model of the vehicle parked in his assigned spot to police but only described the driver as a man wearing "dark articles of clothing," nothing more. While Coleman's description of the offender was admittedly minimal, this does not make his identification of Boyd unreliable. See *Hughes,* 259 Ill. App. 3d at 177 ("The identification can be sufficient even though the witness gives only a general description based on the total impression the offender's appearance made."); *People v. Barnes,* 364 Ill. App. 3d 888, 894 (2006) ("[o]ur supreme court *** has held that omissions in the description offered by a witness do not render his testimony unreliable"); *People v. Slim,* 127 Ill. 2d 302, 308-09 (1989) ("It has consistently been held that a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness'[s] positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made."); *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 28 (a "general or imprecise description does not necessarily render the witness's identification unreliable"); *People v. Tomei,* 2013 IL App (1st) 112632, ¶¶ 50-52 (finding a witness's description of "two white males wearing dark jackets and dark hats" sufficient to sustain defendant's conviction because the owner made a positive identification and testified that he recognized defendant's face); *People v. Williams*, 2015 IL App (1st) 131103, ¶ 75 ("Where the witness makes a positive identification, precise accuracy in the preliminary description is not necessary.") Nothing about Coleman's initial description of the driver was inaccurate. We find this factor favors neither side.

¶ 35    Fourth, Boyd argues that the certainty of Coleman's identification should be given little weight because social science research shows that "an eyewitness's certainty does not correlate to

a reliable identification." Boyd failed to present any social science evidence at trial to support this argument, however. See *People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 32 (finding defendant's argument that social science research suggests a weak correlation between confidence and accuracy of an identification "unpersuasive" where he presented no such evidence at trial to support a finding that the witness's certainty should be given little weight). Moreover, courts have recognized that "expressions of certainty at the time of the initial identification are a relevant indicator of accuracy." *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 32. When Coleman was presented with the showup, he identified Boyd as the man he had seen in the parking lot earlier that day immediately, saying, "yeah, that's him." Because Coleman "had absolutely no hesitation identifying Mr. Boyd," this factor also favors the State.

¶ 36    The fact that Coleman identified Boyd about 30 minutes after he first saw him in the parking lot supports the reliability of his identification as well. See *In re T.B*, 2020 IL App (1st) 191041, ¶ 62 (finding that when a showup takes place shortly after an attack, "a witness has more tools for his identification than just face and build," including a suspect's clothing and hair and therefore has "additional data points to confirm his identification").

¶ 37    Boyd argues that Coleman must have been "stressed" at the time of the showup because "police just told him that the driver he confronted was armed and breaking [into] his co-residents' cars," which undermines the reliability of his identification. However, nothing in the record indicates that Coleman was stressed at the time of the showup. When Officer Salgado informed Coleman and other building residents that the Ford Edge was stolen and a weapon was found inside, resident Brian Wayne said, "He had a gun on him? Holy shit." Coleman, by contrast, said nothing and remained seated and calm, expressing no physical reaction. Coleman's only reference to the weapon came several minutes later after he indicated to Officer Salgado that he would be

able to identify the suspect because the man was parked in his parking spot. He told her, "I parked my car. Walked up to him and just said hey this is my spot. I didn't think much of it, think he had a gun, I thought he just lived in the building or something."

¶ 38    Boyd also argues that because Coleman identified him after the police "told him that [Boyd] was the offender," this irreparably tainted the identification, making any ensuing identification unreliable. As discussed above, however, the police merely indicated that they apprehended a person matching the description provided by witnesses, and expressly told Coleman before viewing the suspect in the showup that he could "say yes or no." Thus, the police did not suggest to Coleman that he needed to identify Boyd as the offender.

¶ 39    When considering the totality of the circumstances and weighing the factors above, we conclude that the evidence supports a finding that Coleman's identification of Boyd was reliable. Therefore, we conclude that the trial court properly denied Boyd's motion to suppress Coleman's identification.

¶ 40                      C. Ineffective Assistance of Counsel

¶ 41    In his opening brief, Boyd argued that his trial counsel was ineffective for failing to offer Salgado's full BWC footage at the suppression hearing. However, because the trial court considered the entire video at trial, Boyd concedes in his reply brief that his ineffective assistance claim is moot. We agree.

¶ 42                      III. CONCLUSION

¶ 43    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 44    Affirmed.